# United States Court of Appeals
## For the First Circuit

No. 09-1835

UNITED STATES OF AMERICA,

Appellee,

v.

VINCENT CHANEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro,  U.S. District Judge]

Before

Torruella, Ripple,* and Lipez,
Circuit Judges.

Robert Herrick for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, Acting United States Attorney, was on brief, for appellee.

July 27, 2011

---

* Of the Seventh Circuit, sitting by designation.

**LIPEZ**, <u>Circuit Judge</u>. Defendant-appellant Vincent Chaney appeals the denial of a motion to suppress evidence seized from him in the raid of a motel room in which Chaney was a guest. Placed on the floor and handcuffed in the wake of his host's arrest on drug charges, Chaney consented to a search of his pants pocket to locate identification; the search turned up seven small bags of crack cocaine. A dozen rounds of .38-caliber ammunition were later discovered in the pocket of his jacket.

After unsuccessfully moving to suppress this evidence, Chaney entered a conditional guilty plea to charges of simple possession of cocaine and possession of a firearm after a prior felony conviction. On appeal, Chaney argues that the police exceeded the scope of his consent by removing cocaine, rather than identification, from his pocket; that his consent was the product of a coercive atmosphere and hence not voluntary; and that all evidence seized was the fruit of an unlawful de facto arrest. Finding no reversible error in the district court's rulings, we affirm.

## I.

The events giving rise to this appeal took place in the course of a police raid on a Manchester, New Hampshire motel room in late 2005. In reciting the facts, we draw on the district court's oral findings of fact at Chaney's suppression hearings as well as testimony taken at those hearings.

-2-

On November 30, 2005, state and federal law enforcement officials in possession of a federal arrest warrant for a man named Peter Boyd, suspected of distributing crack cocaine, went to the Queen City Inn in Manchester, New Hampshire. Past experience flagged the motel as a likely choice for local drug dealers looking for temporary lodging. Shown a picture of Boyd, a clerk at the Queen City Inn confirmed to an investigating United States Marshal that a man of Boyd's appearance was staying in a room at the motel. The marshal summoned four additional federal and local law enforcement officers to the motel to aid in executing the warrant.

The motel room in which Boyd was staying was registered in the name of Brigit Hebert, a woman familiar to the authorities as the subject of several past drug-related arrest warrants. Unbeknownst to the officers, also present in Hebert's motel room was Vincent Chaney. According to his testimony at the suppression hearings, Chaney had come the previous night from Virginia, hoping to visit two of his daughters who were living with their mother in Manchester. Arriving too late to visit with his daughters, Chaney went to a bar and happened upon Boyd, an old acquaintance. Boyd offered to put Chaney up for the night in the room he was sharing with Hebert at the Queen City Inn. Boyd, Hebert, and Chaney were thus all present in Hebert's motel room when the officers arrived early in the afternoon of the next day to execute Boyd's arrest warrant.

Two local detectives were dispatched to cover the rear door to Hebert's motel room while three marshals approached from the front, knocking on the door and announcing their presence. The door opened to reveal Boyd, wearing pajama pants but shirtless and without shoes. Boyd was taken into custody, and the marshals entered the room with their weapons drawn to perform a protective sweep. They found the room darkened and clothing scattered across the floor, with Hebert lying in bed and Chaney, whom the officers did not recognize, standing next to it. The marshals told Hebert to get out of bed and put her hands up, which she did. Chaney was less compliant, edging toward the corner of the bed despite repeated commands to stop moving and lie on the ground. After six or more warnings, Chaney acquiesced and was handcuffed on the floor. The marshals completed their sweep of the main room, the space underneath the bed, and the bathroom, finding in plain view two bags of what appeared to be marijuana (sitting on a windowsill), three crack pipes (on the windowsill and on a chair), and a number of rounds of .22-caliber ammunition (located in a clear bag in the closet).[1]

---

[1] A further search of the premises, conducted later in the day with Hebert's consent, unearthed two firearms (a .22-caliber, pump-action rifle with ammunition in it and a .38-caliber Derringer pistol), a bowl containing a white powdery substance that field-tested positive for cocaine, and various items associated with drug manufacture (baking soda, lighter fluid, and glassine bags). Notably, the Derringer pistol was found under the corner of the bed's mattress, the point toward which Chaney had been edging when the police first entered the motel room.

As the protective sweep was being conducted, the marshals opened the rear door of the motel to admit the local detectives. Detective Brian Newcomb approached Chaney, patted him down for weapons, and then attempted to learn his identity. Chaney was not immediately forthright, telling Detective Newcomb only that his name was Vincent and providing him with several false dates of birth. After the local dispatch reported that it was unable to find a match for the dates of birth in their database, Newcomb asked Chaney if he had any identification. Chaney indicated that he did, and that it could be found in his back pocket. Detective Newcomb asked for and was granted consent to retrieve the identification from Chaney's back pocket, but the pocket turned out to be empty. Asked if the identification might be located elsewhere, Chaney suggested that it might be in his left front pocket. Chaney again consented to have Newcomb search his pocket for the identification.

Detective Newcomb placed his hand in Chaney's left front pocket and removed first a plastic bag that held seven individual plastic bags, each of which contained a "chunky off-white substance"; he then reentered Chaney's pocket and removed a social security card.[2] Newcomb believed the off-white substance in the

---

[2] Chaney disputed the sequence of events in his testimony at the suppression hearing. According to Chaney, he responded to Newcomb's request for identification by removing the social security card from his back pocket and turning it over to Newcomb. Detective Newcomb then allegedly asked Chaney if he had any sharp

bags to be crack cocaine, having seen the substance in his prior law enforcement experience some fifty to one hundred times (a field test later confirmed his suspicions). Newcomb informed Chaney that he was under arrest for possession of crack cocaine with intent to distribute. After learning from dispatch that the social security card found in Chaney's pocket, which bore the name "Vincent Earold Chaney," belonged to a four-year-old boy,[3] Newcomb again asked Chaney for his date of birth. Chaney provided the correct date this time, and a search of police records confirmed his identity and revealed an outstanding warrant for his arrest in Massachusetts for a probation violation.

As Detective Newcomb was escorting Chaney to a police car outside the motel, Chaney asked Newcomb to retrieve a backpack and jacket Chaney had left in the room. Newcomb retrieved a backpack and jacket matching the description provided by Chaney. After Chaney confirmed that they belonged to him, Newcomb searched both items, locating in the jacket pocket a plastic bag containing twelve rounds of .38-caliber ammunition.

---

objects in his pockets, Chaney told Newcomb that he did not, and Newcomb proceeded to search Chaney's other pockets and remove items (including the plastic bags containing cocaine) without consent. In his oral findings of fact, Judge DiClerico adopted Detective Newcomb's version of the consensual search, implicitly discrediting Chaney's account.

[3] The card belonged to Chaney's deceased son, Vincent Chaney, Jr. Chaney stated that he had mistakenly grabbed the wrong identification card when he left his home in Virginia.

Chaney was eventually indicted in the district court on two counts arising out of the incident: one count of simple possession of cocaine base, in violation of 21 U.S.C. § 844(a), and one count of unlawful possession of a firearm after a prior felony conviction, in violation of 18 U.S.C. §§ 922 and 924(a)(2).[4] Chaney moved to suppress all of the evidence seized in the course of his detention and arrest.

The district court held two evidentiary hearings to evaluate possible grounds for suppression. The first, held by Judge DiClerico on September 4, 2008, addressed Chaney's argument that the search of Hebert's motel room was unlawful due to the absence of a valid search warrant. After testimony from Chaney and three of the police officers who conducted the search and arrest, Judge DiClerico ruled that Chaney lacked standing to challenge the search of the motel room. The judge also found that Chaney had consented to a search of his pockets, and that the search of Chaney's jacket before turning it over to him had been reasonable in light of officer safety concerns.

---

[4] Chaney's indictment charged one additional felon-in-possession count related to a 2007 incident where an officer noticed a handgun in Chaney's pocket during a routine traffic stop. Chaney successfully moved to sever trial on the 2007 charge from the 2005 charges. Though the district court initially suppressed all evidence seized in the 2007 traffic stop, we reversed in an earlier appeal filed by the government. See United States v. Chaney, 584 F.3d 20 (1st Cir. 2009).

A second hearing was held before Judge Barbadoro on September 17, 2008.[5] After brief supplemental testimony from two of the officers, Chaney's counsel presented arguments that the search of Chaney's pockets occurred during an unlawful de facto arrest and that Chaney's consent to the search was invalid because it was the product of coercion. Judge Barbadoro rejected the arguments, ruling that Chaney's detention was not a de facto arrest, being limited in duration and reasonable in scope, and that Chaney's consent was voluntary. At the close of the hearing, the judge confirmed that all of the issues concerning Chaney's detention and consent were preserved for appeal:

> It's preserved for purposes of appeal that the entry was illegal. It's preserved for purposes of appeal that the scope of the detention after the entry was improper, and it's preserved for purposes of appeal that any consent given was not valid and does not justify and make lawful the seizure that followed. I think you've presented every possible suppression argument that can be presented.

Chaney subsequently entered into a conditional plea agreement by which he reserved his right to appeal the district court's suppression rulings. Subject to that agreement, Chaney pled guilty to one count of simple possession and one count of

---

[5] Following the first suppression hearing, the case was reassigned to Judge Barbadoro due to Judge DiClerico's unavailability for trial. Judge Barbadoro set the additional suppression hearing in response to concerns from Chaney that certain arguments had not been addressed in the first hearing.

possession of a firearm after a felony conviction.  Judgment was entered against Chaney in April 2009, and this timely appeal followed.

**II.**

In evaluating the district court's denial of Chaney's suppression motion, we review the court's findings of fact for clear error and its legal conclusions de novo.  United States v. Larios, 593 F.3d 82, 92 (1st Cir. 2010).  Chaney raises three challenges to the district court's ruling.  First, he argues that the removal from his pocket of plastic bags containing cocaine exceeded the scope of his consent, which, he asserts, was limited to a search of his pocket to locate identification.  Second, he argues that, even if he consented to a general search of his pants pocket, the consent was involuntary because of an unduly coercive atmosphere.  Third, he argues that the consent was the fruit of an unlawful, de facto arrest, and thus any evidence found in the course of the search must be excluded.  We address each of Chaney's contentions in turn.

## A.  Scope of Consent

It is a fundamental principle of Fourth Amendment law that a warrantless search may be conducted with the voluntary consent of a person authorized to give such consent.  See United States v. Stierhoff, 549 F.3d 19, 23 (1st Cir. 2008) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)).  A

warrantless search may not, however, exceed the scope of the consent granted. United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). The scope of the consented-to search is generally defined by the expressed object of the search, which is "measured by a test of objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the officer and subject?'" Id. at 286-87 (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

The United States raises a threshold objection to our consideration of Chaney's scope-of-consent argument, contending that the issue is forfeited due to Chaney's failure to squarely raise it in the suppression hearings.[6] There may be some force to the government's argument, as the scope-of-consent argument Chaney presses on appeal does not appear to have been made below. See United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998) (forfeiture "applies not only when a defendant has failed altogether to make a suppression motion but also when, having made one, he has neglected to include the particular ground that he later seeks to argue"). On the other hand, Chaney raised generally the issue of the

_____

[6] The government identifies this argument as a claim of waiver, but it is actually one of forfeiture. As we have often explained, an argument or right is waived only when it is intentionally abandoned; mere failure to raise an argument or right due to inattention or neglect constitutes forfeiture. See United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). The distinction is a substantive one. Waiver generally bars an issue from being raised on appeal, whereas forfeiture allows the issue to be reviewed for plain error. Id.

adequacy of his consent before the district court, and the court assured him that it was "preserved for purposes of appeal that any consent given . . . does not justify and make lawful the seizure that followed." Because we may readily dispose of Chaney's argument on the merits, we sidestep the government's claim of forfeiture and address the scope-of-consent issue head-on. See Stierhoff, 549 F.3d at 23.

According to testimony from Detective Newcomb, who performed the search of Chaney's pocket, Chaney "stated that [the detective] could go through his left front pocket and find [Chaney's] identification." Chaney argues that the "expressed object" of this consented-to search was retrieval of identification, and thus the removal of the plastic bags from his pocket fell outside of the scope of his consent. We disagree.

The tight confines of a pants pocket leave a searching hand little room for maneuvering and distinguishing between various objects that may be contained therein. Given consent to retrieve an object from such a cramped space, it is objectively reasonable to assume that the consent extends to the removal of items that either may constitute the object of the search and cannot be immediately identified or that obstruct further access to other items in the pocket. Nothing in Chaney's exchange with Detective Newcomb suggests that he intended to withhold consent for these sorts of practical measures that are reasonable incidents to the

search of a pocket. Chaney's argument appears to be that, absent explicit permission to remove items other than evidence of identification, the detective was required to fish around in the pocket until he located an item that he could positively identify to be some form of identification and that could be removed without dislodging other items. The "typical reasonable person" would not so interpret Chaney's exchange with the officer.[7]

Because it was objectively reasonable for Detective Newcomb to believe that the scope of consent extended to the removal of plastic bags from Chaney's pocket in the course of searching for identification, we find no unconstitutional excursion beyond the boundaries of Chaney's consent. See Jimeno, 500 U.S. at 249 ("The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted [the challenged search].").[8]

---

[7] This is not to say that Chaney's consent should be read as a generalized authorization to search his entire pocket, however. If the detective had immediately located identification, turning out the rest of Chaney's pocket would surely exceed the scope of consent. But the record does not suggest that such was the case: Detective Newcomb testified at the second suppression hearing that he removed the plastic bag from Chaney's pocket before the identification card.

[8] Both parties discuss the possible application of the "plain feel" doctrine of Minnesota v. Dickerson, 508 U.S. 366 (1993) to the present case. That rule, an extension of the familiar "plain view" doctrine, allows the seizure of contraband readily identified by feel during a Terry frisk. While we agree with Chaney that the doctrine would have no application where testimony suggests that

## B. Voluntariness of Consent

Chaney next raises a more fundamental challenge to the consent search of his pocket, arguing that the coercive atmosphere of the police raid rendered his consent involuntary. Whether a suspect's consent to a warrantless search was truly voluntary or, instead, the product of coercion "is a question of fact to be determined from an examination of the totality of circumstances." Marshall, 348 F.3d at 286. Among the factors we will consider in making that determination are the suspect's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Id. Upon close review of the record, we can find no clear error in the district court's finding that Chaney freely and voluntarily consented to the search of his pants pocket.

Chaney draws on a number of factors in trying to paint a picture of coercion. First, Chaney highlights the officers' "show of force" in entering the motel room with guns drawn. Setting aside the fact that his consent was given after all occupants of the room were handcuffed and the excitement of the initial entry had passed, neither the number of officers who entered the room (five) nor the readiness of their weapons suggests an overwhelming

the contraband was not identified by feel but instead by visual inspection after removal from his pocket, we need not directly address these arguments given our holding that the removal of cocaine from Chaney's pocket fell within the scope of the consent granted.

-13-

show of force.  See United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (finding the fact that ten to fifteen officers entered hotel room with guns drawn insufficient to void voluntariness of consent).  Chaney notes as well that the occupants of the room were asleep when law enforcement arrived at the motel room.  The evidence is mixed as to whether Chaney, who was standing and fully clothed when the officers entered the room, was actually awakened by the officers' arrival.  Regardless, the mere fact of having been recently asleep does not necessarily affect one's capacity to voluntarily grant consent.  Although Chaney cites the officers' failure to advise him of his right to refuse consent to the search, a factor that is certainly relevant to voluntariness of consent, "[w]e have repeatedly held that the failure to advise a defendant of his right to refuse consent does not automatically render such consent invalid."  Id.

Importantly, this was not Chaney's first encounter with law enforcement.  He had been arrested on more than a dozen prior occasions and convicted of a comparable number of criminal offenses.  It is reasonable to infer that a veteran of the criminal justice system will be "less likely than most to be intimidated by the agents' show of force."  United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993) (quoting United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976)).  Moreover, Chaney's conduct during the police raid betrayed no evidence of intimidation; to the

-14-

contrary, he ignored repeated commands from the police to stop moving when they first entered the motel room.

In short, on this record, we can discern no clear error in the district court's finding that Chaney voluntarily consented to the search of his pocket.[9]

## C.  De Facto Arrest

Chaney alternatively contends that the evidence seized from him was the fruit of an unlawful de facto arrest.[10]  While the period of detention leading to the discovery of crack cocaine in Chaney's pocket certainly bore some typical indicia of an arrest, we concur with the district court's conclusion that the circumstances did not rise to the level of a de facto arrest.

Any detention of an individual by a police officer constitutes a seizure and, to be lawful, must be adequately justified under the Fourth Amendment.  Morelli v. Webster, 552 F.3d

---

[9] We note as well that we have been reluctant to find coercion in the commonplace context of a request for identification.  See United States v. Winston, 444 F.3d 115, 122 (1st Cir. 2006) (noting that the "mundaneness of identification makes it unlikely that agents would bother to use coercive methods to obtain it").

[10] There appear to be two aspects to his "fruit of the poisonous tree" argument, see Wong Sun v. United States, 371 U.S. 471, 484-85 (1963): first, that the purported de facto arrest caused Chaney to consent to the search of his pocket, cf. United States v. Navedo-Colón, 996 F.2d 1337, 1338-39 (1st Cir. 1993) (examining whether consent to search was fruit of illegal search), and second, that the search of Chaney's jacket pocket incident to his being taken into custody was a product of the de facto arrest. Because we find no de facto arrest, we do not reach the question of whether such a finding would require suppression of the evidence located during those two searches.

12, 19 (1st Cir. 2009). The contours of the showing necessary to satisfy the Fourth Amendment depend on the nature of the detention: arrests, whether formal or de facto, require that the detaining officer have grounds for probable cause, whereas temporary detentions (including investigatory or Terry stops, see Terry v. Ohio, 392 U.S. 1, 21 (1968)) "may be grounded on a lesser showing equivalent to reasonable suspicion." Id.

Chaney does not contest that the police had reasonable grounds to temporarily detain him and ascertain his identity in the course of securing the motel room. Instead, he argues that the conduct of the detention -- in particular, that the officers entered with guns drawn, ordered him to the ground, and handcuffed him -- transformed it from investigatory stop into de facto arrest. The distinction is critical. Chaney argues, correctly, that no probable cause existed at the time of his detention,[11] and thus the detention can survive constitutional scrutiny only if it was in the nature of a temporary investigative stop.

There exist "no scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests." Id. at 20. Instead, we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position "to be tantamount to

_____

[11] The officers had no knowledge of who Chaney was or why he was present in the motel room, and thus plainly could have no probable cause for arrest.

-16-

being under arrest." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  This objective, suspect-focused inquiry is informed by our assessment of the reasonableness of the detaining officer or officers' actions in response to developing conditions.  Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as "the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop."  United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) (quoting United States v. Owens, 167 F.3d 739, 748 (1st Cir. 1999) (alterations in original)).

The crux of the issue before us is whether the officers' entry into the motel room with drawn guns and their handcuffing of Chaney were reasonable.  The use of drawn guns and handcuffs, being some "of the most recognizable indicia of a traditional arrest," will generally tilt the scale to some significant degree toward a finding of de facto arrest.  See United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998).  However, we have repeatedly noted that neither factor is alone determinative.  See United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005) ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms

-17-

a valid <u>Terry</u> stop into a de facto arrest.").[12]  In <u>Acosta-Colon</u>, we explained that "when the government seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a <u>Terry</u> stop, it must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm."  <u>Acosta-Colon</u>, 157 F.3d at 18-19 (emphasis omitted).  We think this inquiry applies with equal force in assessing whether the use of drawn handguns was reasonable in initiating a stop.

We can locate no error in the district court's finding that the specific circumstances of the November 30, 2005 raid gave rise to a reasonable concern for officer security that justified the use of handcuffs and drawn handguns.  The unanticipated presence, in a darkened motel room inhabited by two suspected drug dealers, of an unfamiliar man who ignored repeated orders from the police to stop moving and drop to the ground might alone be enough to justify more intrusive measures for briefly securing him during

---

[12]  <u>See</u> <u>also</u> <u>Acosta-Colon</u>, 157 F.3d at 18 ("[T]he use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest."); <u>United States</u> v. <u>Lee</u>, 317 F.3d 26, 31-32 (1st Cir. 2003) (fact that officers drew guns and blocked defendant's vehicle from leaving did not convert investigative stop into de facto arrest); <u>United States</u> v. <u>Taylor</u>, 162 F.3d 12, 21 (1st Cir. 1998) (same).

an investigative stop.  See United States v. Andrade, 551 F.3d 103, 113 (1st Cir. 2008) (more physically intrusive Terry stop justified where suspect refused officer's order to stop); United States v. Taylor, 716 F.2d 701, 709 (9th Cir. 1983) (holding that no de facto arrest had occurred where police approached the suspect with guns drawn and handcuffed him after he twice refused to raise his hands and "ma[de] furtive movements inside the truck where his hands could not be seen").  There were, however, still other factors here that counseled particular caution.  The officers knew that Boyd, the subject of the arrest warrant, had an extensive criminal history, and a preliminary protective sweep of the motel room located not just drug paraphernalia but also ammunition.  Moreover, the motel room was littered with clothing, which easily could -- and, as was later discovered, did -- conceal a weapon within close reach of the occupants.

Under circumstances such as these, especially in the close quarters of a motel room, we are mindful of the need for officers to safely secure the scene.  "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" Brigham City v. Stuart, 547 U.S. 398, 403 (2006), and "[p]olice officers engaged in an otherwise lawful stop must be permitted to take measures . . . they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others," Acosta-Colon, 157 F.3d at 18.

We find the use of handcuffs and entry into the motel room with drawn guns to have been a reasonable precaution here.[13]

Nor do the other relevant aspects of Chaney's detention support a finding of de facto arrest. Chaney was detained for fewer than five minutes before being arrested for possession of cocaine. We have held significantly longer periods of detention to fall short of de facto arrest. See, e.g., Owens, 167 F.3d at 749 (noting that there is no talismanic time beyond which a Terry stop becomes unreasonable and holding that detention of fifty minutes was not de facto arrest); United States v. McCarthy, 77 F.3d 522, 531 (1st Cir. 1996) (holding that seventy-five-minute detention in locked rear passenger compartment of police car was not de facto arrest). Moreover, during the short period for which Chaney was detained, the police officers worked diligently towards the investigative purpose for which he was being held -- namely, determining Chaney's identity. See Trueber, 238 F.3d at 94 (finding no de facto arrest where defendant was detained for fifteen minutes of questions that were "brief and to the point[,] . . . targeted at ascertaining [the defendant's] identity, his reasons for being in the country, and whether he was involved in the suspected illegal activity"). Finally, it should have been reasonably clear to Chaney that Boyd, not Chaney, was the intended

---

[13] We emphasize, however, that such forceful and intrusive measures have no place in routine investigatory detentions. Acosta-Colon, 157 F.3d at 18.

target of the raid: Boyd was immediately seized and handcuffed by the police upon their entry and was quickly led out of the motel room. The fact that Chaney and Hebert were not similarly seized, but instead held in the room for follow-up questioning, should have suggested that their detention was merely incidental to Boyd's arrest.

In light of these circumstances, we do not think that a reasonable person standing in Chaney's shoes would understand that he was subject to anything other than "a brief period of detention at the scene while the police sought by means of a moderate number of questions to determine his identity and to obtain information confirming or dispelling their suspicions." Id., 238 F.3d at 93 (quoting United States v. Streifel, 781 F.2d 953, 962 (1st Cir. 1986)). Accordingly, we find no error in the district court's conclusion that Chaney's detention did not constitute a de facto arrest warranting the suppression of evidence.

## III.

Having closely reviewed the record, we are persuaded that the district court did not err in declining to suppress evidence seized from Chaney during the November 30, 2005 raid. The district court's judgment is therefore affirmed.

So ordered.