# United States Court of Appeals
## For the First Circuit

No. 11-1215

UNITED STATES OF AMERICA,

Appellee,

v.

ADAM BRAKE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro,  U.S. District Judge]

Before

Lipez, Selya and Howard,
Circuit Judges.

Bjorn Lang, Assistant Federal Public Defender, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

December 30, 2011

**HOWARD**, **Circuit Judge**.   The defendant Adam Brake was charged with one count of possession with an intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).   He moved to suppress the drugs as evidence, arguing that they were obtained from him in violation of the Fourth Amendment through an unlawful Terry stop, an illegal frisk, and an involuntary consent to search.   The district court conducted an evidentiary hearing at which Brake did not testify.   After crediting the police account, the court denied the suppression motion.   Brake pleaded guilty but preserved his right to appeal the constitutional issues, which he now exercises.   Discerning no error, we affirm the conviction.

## I. Background

One afternoon in January 2010, the Somersworth, New Hampshire police department received a 911 call from a residence reporting a man with a handgun making threats at that home; a fight was possibly ensuing.   Several police officers responded, arriving at the scene within two minutes.   The officers began walking toward the site of the call, a duplex residence on Franklin Street.   As Detective Thomas Phelan approached within about 30 yards, he saw two men walking toward the street, in the short driveway next to the target residence.   They were dressed in baggy jeans and bulky, hooded sweatshirts.

The police officers watched the men turn onto the sidewalk and continue walking toward a parked red minivan.   Phelan

saw the men stop at the van, where one slid open the side door and the other bent inside of the vehicle. The two momentarily concluded their business at the van -- the nature of which the officers could not discern -- then resumed travel on foot in a direction away from the police officers. The officers were not certain whether the men were aware of their presence. Concerned that the pair may have been involved with the reported disturbance and might be armed, Detective Phelan directed two patrol officers to stop and identify the men. Patrolman Larry Mondene and his partner ran after them, trying to get their attention by shouting "hey." When the men did not immediately respond, the officers continued their pursuit, commanding them to "stop." The duo did so and turned to face the officers.

One of the men provided his identification at the officers' request. Brake indicated that he did not have physical identification on him, but he did give his name and date of birth. The patrolmen informed them of the nature of the reported complaint and explained their intent to pat them down to check "for any weapons or anything." While performing the pat-down search, Mondene felt a bulky, "squishy" object that "felt like a bag" in the front pocket of Brake's sweatshirt. Mondene described it as "[r]oughly the size of a quart size bag" which was "full of something." Discerning that the bag was not a weapon, Mondene asked Brake what "he had in his pocket." During a brief colloquy

between them, Brake indicated that the item was a plastic bag that he had found in the bushes near the duplex. He explained that he normally picked up trash from the ground, because on a prior occasion he had discovered money by doing so. Patrolman Mondene expressed disbelief about Brake's purported habit of garnering garbage, and Brake told the patrolman that he intended to bring the item to his friend's house and open it there. The colloquy continued.

Officer Mondene asked Brake, "would [he] mind just taking it out" of his pocket, and Brake replied "sure" and did so without hesitation. It was a dark trash bag that had been cut and knotted. Mondene asked Brake whether he was curious about its contents, to which Brake responded by opening the bag.[1] After looking into it, Brake threw the bag down and said "those aren't mine." Officer Mondene picked it up and saw several hundred pills inside.

By all accounts, Brake was entirely cooperative during the encounter, which lasted a few minutes, and the tone between Brake and Mondene remained cordial throughout. The two patrolmen never drew their weapons, threatened to use handcuffs, or placed

---

[1]At the suppression hearing, defense counsel cross-examined Mondene, making use of a written report in which Mondene had previously described this portion of the discourse slightly differently. The report indicated that Mondene had asked the defendant to open the bag, rather than the defendant simply doing so in response to a question by Mondene about whether Brake was curious. To the extent that the district court took the report into account, it nevertheless found that Mondene had not issued any commands or instructions obliging Brake to open the bag.

their hands on Brake other than to conduct the brief pat-down. Neither did they inform Brake that he was free to leave after the pat-down search or that he need not cooperate with Mondene's inquiries about the bag.

It was later determined that the bag contained more than six hundred OxyContin (oxycodone) tablets of varying dosages and nearly one hundred generic oxycodone tablets of another dosage. After Brake was charged with possession with an intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), he filed a suppression motion challenging the constitutionality of the stop, the frisk, and his consent to the search that disclosed the bag and its contents.

Although Brake did not testify at the suppression hearing, the record reveals that the district court carefully evaluated the credibility of the police witnesses. Crediting their account, the court found both the stop and the frisk lawful, and also found that Brake had opted to cooperate with the police and had consented to reveal the bag and its contents. After his effort to suppress the inculpatory evidence failed, Brake pleaded guilty but appealed as to the preserved suppression issues.

## II. Governing Law and Analysis

Brake reprises his claims made in the district court that the police lacked reasonable suspicion justifying either the Terry

stop or the pat-down frisk, and that his consent to remove the bag from his pocket and open it was not voluntary.

In reviewing a district court's denial of a motion to suppress, we review the facts "in the light most favorable to the district court's ruling on the motion, and we review the district court's findings of fact and credibility determinations for clear error." United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (citation, internal quotation marks and brackets omitted). "A clear error exists only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." Camacho, 661 F.3d at 723 (internal quotation marks omitted); see also United States v. Jones, 523 F.3d 31, 36 (1st Cir. 2008). Under the clear error standard for factual findings, "we will uphold the denial of a motion to suppress as long as any reasonable view of the evidence supports it." Id. (internal quotation marks and citations omitted).

The district court's determination of "whether consent is free and voluntary is a question of fact" which involves "an examination of the totality of the circumstances surrounding the relevant transaction between law-enforcement authorities and the consenting party." Jones, 523 F.3d at 37. Its factual findings relating to the validity of the consent are thus reviewed for clear error. Id. We review de novo, however, "the district court's conclusions of law, including its application of the law to the

facts, its . . . reasonable suspicion determinations, and [its] ultimate legal decision to grant or deny the motion to suppress." See Camacho, 661 F.3d at 724.

## A. **The Stop and Frisk**

Limited investigatory seizures known as Terry stops and oft-accompanying pat-down frisks are included within the ambit of Fourth Amendment protections against unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1(1968); see Camacho, 661 F.3d at 724-25. In essence, a Terry stop is a brief detention of an individual for questioning based on a police officer's reasonable suspicion that the person is or has been engaged in criminal activity. See United States v. Pontoo, No. 10-2455, 2011 WL 6016141, at *3 (1st Cir. Dec. 5, 2011); Camacho, 661 F.3d at 726. Reasonable suspicion must be more than a hunch but need not amount to probable cause. See Terry, 392 U.S. at 22; Camacho, 661 F.3d at 726. More definitively, the officer must have a particularized and objective basis for suspecting the person stopped of criminal activity, rooted firmly "in specific and articulable facts." Pontoo, 2011 WL 6016141, at *5 (internal quotation marks omitted); see also United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) (noting that court also considers a police officer's rational inferences drawn from the specific facts); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (emphasizing that "reasonable suspicion" must be determined "case by case" with "broad-based

consideration of all the attendant circumstances"). Similarly, a pat-down frisk also must be grounded on specific articulable facts giving rise to a suspicion that the individual seized may be armed and dangerous to the officer or to others. See Terry, 392 U.S. at 24; Camacho, 661 F.3d at 728; Dancy, 640 F.3d at 461.

Here, the facts display reasonable suspicion with respect to both the stop and the pat-down. With respect to the stop, the 911 caller had reported the presence of a man with a handgun at the residence making threats and that a fight seemed imminent. See Romain, 393 F.3d at 73-74 (contrasting reliability of information provided by a 911 caller who is at the site of the reported criminal activity with the holding in Florida v. J.L., 529 U.S. 266 (2000), in which uncorroborated information from an anonymous tip emanating from an "unknown caller" phoning from an "unknown location" was deemed insufficient to warrant a Terry stop). A potentially fatal situation may have been rapidly cresting; indeed, five police officers responded, arriving without delay. The police immediately noticed two men who, given their temporal and spatial connection to the scene, may very well have just left the residence. Cf. United States v. Golab, 325 F.3d 63, 66-67 (1st Cir. 2003) (holding that Terry stop was improperly based only on an "impermissible hunch" in part because the seized car was located in a remote parking lot and thus lacked a geographical connection to the site of the suspected criminal activity). The baggy clothing

that the men wore easily could have concealed a handgun.  Finally, the cohorts' conduct at the parked van gave rise to a fair suspicion that they may have either deposited a gun or retrieved additional weaponry.  Although their actions could have been entirely innocent, the circumstances reasonably supported a more sinister explanation.  See United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990) (noting that "[u]nder Terry, the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation.").

These circumstances called for quick decision-making by the police.  See generally United States v. Sharpe, 470 U.S. 675, 686 (1985).  Viewing the whole fabric through the lens of a reasonable and cautious police officer, we conclude that specific and articulable facts justified the Terry stop to investigate Brake's possible involvement in the reported disturbance.

Turning to consider the frisk, we need not tarry long. Brake argues that the frisk was unlawful because his cooperative demeanor and lack of any furtive or threatening gestures ameliorated any legitimate concern that he may have posed a risk to the officers.  We disagree.

The purpose of the initial stop was for the police to determine whether one of the men was the armed menacing threat that had prompted the 911 call.  Again, the pair's baggy garb provided

ample stow-away opportunity for a firearm, and their conduct at the van legitimately heightened police concern that the men had procured additional weaponry. Their failure immediately to heed police attempts to stop them -- even if an innocent explanation existed -- further supported the officers' reasonable safety concerns under the circumstances. See United States v. Wright, 582 F.3d 199, 212 (1st Cir. 2009) (holding that the defendant's failure to heed police command to stop supported reasonable suspicion and that seemingly innocuous acts can in combination culminate in a reasonable suspicion). The officers reasonably could have believed that the men were deliberately ignoring them as they attempted to remove themselves from the scene without showing concern for police presence.

Brake's subsequent compliance during his interaction with the police in no way vitiated an otherwise justified perception that he posed an immediate danger to them by his possible possession of a handgun under these circumstances. See Schubert v. City of Springfield, 589 F.3d 496, 502 (1st Cir. 2009) (concluding that defendant's innocuous appearance did not undercut the reasonableness of the police officer's concern about potential criminal activity based on his "on-the-spot" observations of specific, articulable facts). We emphasize once again the importance of police officer safety during a Terry stop: "In a world fraught with peril, officer safety must have a place at the

-10-

forefront of police work.  It follows logically that a pat-frisk may accompany an investigatory stop whenever an officer 'has reason to believe that the suspect is armed and dangerous.'" Pontoo, 2011 WL 6016141, at *8 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Stopping an individual thought to be recently involved in an armed conflict unquestionably warrants precautionary measures for the protection of the investigating officers. See id. (holding that pat-frisk was justified where "the individual stopped is suspected of having just committed a murder").

Without hesitation, we conclude that frisking Brake for weapons under these circumstances was within the bounds of constitutional police conduct.  See Terry, 392 U.S. at 27 (remarking that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger.").

## B. **The Squishy Bag**

What is left then, is to review the post-frisk events concerning the bag in Brake's pocket.  Without challenging whether or how long the Terry stop could extend beyond the pat-down, Brake contends that, in all events, his conduct in retrieving the bag from his pocket was not based on his voluntary consent to search. Accordingly, he urges us to hold that the police seizure of the bag

-11-

violated his Fourth Amendment right to be free from an unreasonable search.

A warrantless search does not offend the Fourth Amendment when it is properly circumscribed and stands on a voluntary consent given by a person so authorized. United States v. Chaney, 647 F.3d 401, 405-06 (1st Cir. 2011). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.'" Chhien, 266 F.3d at 7 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). In determining voluntariness, the focus is often on whether the individual's will has been overborne and his capacity for self-determination critically impaired. See Schneckloth, 412 U.S. at 225; United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996).

Determining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances, rather than on a mechanical application of legal factors to a factual scenario. See United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008); United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). The common list of relevant fact drivers for assessing whether consent was voluntary includes the person's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Chaney, 647 F.3d at 407 (internal quotation

-12-

marks omitted); see Vanvliet, 542 F.3d at 264 n.2 (listing range of pertinent factors). While "there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it," valid consent requires "more than mere acquiescence in the face of an unfounded claim of present lawful authority." United States v. Perez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000) (citing Schneckloth, 412 U.S. at 234 and Bumper v. North Carolina, 391 U.S. 543, 548 (1968)); see also Ohio v. Robinette, 51 U.S. 33, 40 (1996); Chaney, 647 F.3d at 407-08; Vanvliet, 542 F.3d at 264.

Brake argues that he did not voluntarily consent to removing the bag from his pocket, but was "acced[ing] to directives from a police officer whom he understood was continuing to detain him." According to Brake, because Mondene did not inform him that he was free to leave after the pat-down search, a reasonable person would have understood that he remained detained, and thus a proper reading of the evidence establishes that "[b]efore the frisk he was submitting to the show of lawful authority by Mondene [and] after the frisk he simply continued to do so." This compliance and submission, he says, cannot amount to voluntary consent.

The district court found that Brake chose to cooperate with the police of his own free will throughout the encounter, having decided to pursue a "strategy of cooperation and ignorance" about the origin and contents of the bag. The record supports this finding. In particular, the testimony shows that Brake was

-13-

cooperative with Mondene from the beginning of their interaction, and indeed he displayed no nervousness or anxiousness of any kind during the entire encounter -- even when Mondene discovered the bag. Mondene testified that when asking about the bag he intentionally shifted to an inquiry mode rather than a more commanding one because in his mind the purpose of the Terry stop had concluded once he conducted the pat-down frisk and found no weapons. Brake provided an immediate account of the bag's origin, and without hesitation complied with Mondene's request: proceeding to display the bag, reveal its contents, and then throw it on the ground while disclaiming any ownership. Although the defendant did not testify, the district court was careful to consider whether the police testimony standing alone was a credible account of the entire interaction and found that it was. Brake does not challenge this credibility finding,[2] and on this record, we see no clear error in the district court's determination that Brake voluntarily chose to take a nothing-to-hide stance with the police and to consent to retrieve the bag from his pocket and show its contents.

We disagree with the appellant that the factual account leads to the singular conclusion that he was merely submitting to

---

[2]Brake's decision not to challenge the district court's judgment on witness credibility is understandable. Appellate review is especially deferential to such judgments, and we overturn them "only if, after reviewing all of the evidence, we have a definite and firm conviction that a mistake has been committed." United States v. Jones, 187 F.3d 210, 214 (1st Cir. 1999) (internal quotation marks omitted). The record displays no such mistake.

a claim of lawful authority, rather than voluntarily consenting to a search. The legal authority Brake relies on in support of his position does not help him, because Mondene did not represent, either expressly or impliedly, that Brake was required to pull the bag out of his pocket or to reveal its contents. Cf. Bumper v. North Carolina, 391 U.S. 543, 546-50 (1968) (holding that the government cannot satisfy its burden of proving that consent was freely and voluntarily given when homeowner simply stated "go ahead" in response to police declaration of a warrant to search the residence; "[t]he situation is instinct with coercion -- albeit colorably lawful coercion"); United States v. Barnes, 506 F.3d 58, 63 n.6 (1st Cir. 2007) (noting that the defendant produced a drug cache from his person after the police ordered him to submit to a visual body cavity search pursuant to police department policy "only because he recognized that otherwise, the search would be performed"); United States v. Escobar, 389 F.3d 781, 786 (8th Cir. 2004) (holding that police officer's representation that drug-sniffing dog had "alerted on" the defendants' travel bag communicated the message that probable cause to search existed and they had no choice but to permit it; thus the defendants acquiesced to display of authority rather than voluntarily consenting to the search).

That Mondene inquired about the bag in the context of what a reasonable person may have seen as a continuing Terry stop

does not, by itself, convert Brake's volitional decisions into coerced compliance.  See United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (noting that while the possibility of coercion may be heightened if the person is in custody at the time consent is obtained, "custody alone has never been enough in itself to demonstrate coerced consent to search" (internal quotation marks and ellipsis omitted)); see also Florida v. Bostick, 501 U.S. 429, 435-36 (1991) (explaining that consent can be voluntary even though detainee does not feel free to leave).  Although the lack of any instruction that Brake was free to leave or free to refuse to cooperate may be relevant to a voluntariness inquiry, such circumstances do not automatically render consent invalid.  See Robinette, 519 U.S. at 40 (concluding that an officer conducting a highway stop need not inform driver he is free to go before requesting permission to conduct a search); Chaney, 647 F.3d at 407-08 (noting that police failure to advise a defendant of his right to refuse to consent does not automatically vitiate voluntary consent).  Simply put, there is no indication that Brake was coerced in any fashion to pull the bag out of his pocket and open it for the police officer to see its contents.  Accordingly, the appellant has not demonstrated clear error.

## III. Conclusion

The judgment is **affirmed.**