**UNITED STATES of America**

**v.**

**Michael CORREA, Defendant.**

**Cr. No. 11–157 S.**

United States District Court,
D. Rhode Island.

July 5, 2012.

Ly T. Chin, Assistant U.S. Attorney, Richard W. Rose, Assistant U.S. Attorney, U.S. Attorney's Office, Providence, RI, for United States of America.

Kevin J. Fitzgerald, Federal Defender's Office, Providence, RI, for Defendant.

## OPINION AND ORDER

WILLIAM E. SMITH, District Judge.

Defendant Michael Correa was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Correa moves to suppress the evidence obtained in the July 7, 2011 search of his car. For the reasons set forth herein, the motion is denied.

### I. Background

The Court held an evidentiary hearing on Defendant's motion to suppress on April 18 and May 7, 2012.

Sergeant Curt Desautels, an officer with the Violent Crime Task Force of the Providence Police Department, and Officer Jonathan Desmarais, also of the Providence Police Department, testified on behalf of the government. Defendant offered the testimony of Josue Calderone, a passenger of the vehicle Correa was driving on the night of his arrest. The following facts are gleaned from their testimony.

Early in June 2011, in the Silver Lake area of Providence, Sergeant Desautels was approached by an anonymous source with whom he was not familiar. The source told him that a "subject who goes by the name of Mike, a Hispanic male, has a firearm ... in the engine compartment area" of his car. (Hr'g Tr. Vol. I, 6:25–7:2, Apr. 18, 2012, ECF No. 24.) The source further described the vehicle belonging to "Mike" as a green, four-door Maxima with over-sized rims. Desautels did not take any notes on the tip, and he did not share it with anyone in the Department.

Later that month, Desautels came across the vehicle described by the tipster and recognized the driver from prior contacts to be Defendant Michael Correa. Desautels searched police databases and discovered that Correa had a lengthy ar-

rest record and several convictions. Desautels observed Correa over a period of a couple of weeks, and saw him engage in behavior on three or four occasions that, in his experience, was consistent with street-level drug dealing. He did not follow up or take notes on the observed transactions.

On July 7, 2011, after Desautels effected an unrelated arrest, the arrestee expressed great concern that he would be held as a probation violator, and, in an apparent attempt to obtain leniency, he offered to provide the police with information about a person with a firearm. The arrestee told Desautels that a green, four-door Maxima with fancy rims on it would be going to the area of Thurbers Avenue and Eddy Street, on the South Side of Providence, and that the car would contain a firearm. The arrestee did not identify Correa by name, and Desautels did not make the connection to the June 2011 investigation. Desautels asked a detective to stay at the police station with the arrestee while he investigated the tip.

Desautels then rounded up four other officers to stake out the area with him. At about 10:45 p.m., the officers left the station; Desautels and Desmarais drove an unmarked police vehicle, Officers Melaragno and Sullivan were in a second undercover vehicle, and Officer Soriano joined them in a marked police cruiser. The officers drove to the South Side, near Thurbers and Eddy, looking for the green Maxima. Desautels and Desmarais spotted the Maxima as the vehicle drove by, and he recognized the driver to be Correa. It was at that point, according to his testimony, that Desautels recalled the June 2011 investigation.

Two other individuals were in the car with Correa. Officer Desmarais recognized the person in the backseat to be Josue Calderone, a member of the Hart-

ford Soldiers neighborhood gang. The officers testified that the Hartford Soldiers have had a violent feud with certain residents of the Manton Heights public housing complex, located in the Olneyville neighborhood of Providence. The officers testified that they found Correa's and Calderone's presence on the South Side to be suspicious.

After the officers followed the green Maxima for some time, while trying to remain inconspicuous, Desautels observed the car turn left onto Byfield Street without the use of a turn signal. Desautels put his lights and spotlight on, and Soriano pulled in from a side street, going bumper to bumper with the Maxima. The car came to a stop, and Desautels directed the passengers to put their hands in the air and illuminated the interior of the car. He observed Josue Calderone, who was seated in the backseat, kick something that appeared to them to be a firearm under the driver's seat.

Desautels then pulled Calderone out of the car and alerted Desmarais to the presence of a firearm. The officers placed the three passengers in handcuffs and secured them. They put Calderone and the third passenger, Gomez,[1] on the sidewalk, and directed Correa to the front of the vehicle, leaning him against the car.

Desautels retrieved the item kicked under the backseat, only to discover that it was a toy gun. He told Correa: "You're all set; it's a toy gun." (Tr. 29:20–21.) Upon hearing this news, Correa appeared surprised and happy and said: "I got nothing, you can go ahead and search the vehicle." (Tr. 29:23–24.) Desautels then confirmed with Correa that he did not mind if the officers searched the entire vehicle, and Correa agreed, noting that the vehicle was registered to his sister but

---

1. There was no testimony as to the third pas-    senger's first name.

belonged to him. Desautels testified that this exchange took place either while he was walking Correa back to the Maxima or while he was placing Correa in the rear of his police car. Desmarais testified that Desautels took Correa to the back of his cruiser and when he returned, he said, "Okay, let's search it." (Tr. 96:3–15.) Desmarais said he did not hear what transpired between Desautels and Correa in the back of the cruiser.

Desmarais and Desautels proceeded to search the car, retrieving a loaded firearm wrapped in a white sock from the air cleaner of the vehicle's engine compartment. Thereafter, Correa, Calderone, and Gomez were arrested and transported to the police station. Correa asked for a lawyer, at which point the officers abandoned any discussion with him. After the arrest, and in accordance with protocol, Desautels contacted Agent Yankee of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to report a firearm arrest.

At the evidentiary hearing, Defendant offered the testimony of Josue Calderone. Calderone testified that he was fishing in India Point Park the night of July 7, 2011. Correa picked him up from fishing, and from there, they went to look at a car. On the way to look at the car, at approximately 7:30 p.m.,[2] a number of unmarked police cars stopped Correa's car. The officers removed the passengers from the car, patted them down, and placed them in handcuffs. Correa was placed in the backseat of the cruiser in handcuffs. The officers showed Calderone the gun and asked him if it belonged to him. Calderone testified that at no point did he hear Correa consent to a search.

Calderone has a number of felony convictions, including for possession of marijuana, possession of a controlled substance, and possession of a firearm without a license, as well as a number of non-felony convictions. He confirmed that he was a member of the Hartford Soldiers at one time, and he revealed a tattoo on his forearm signifying his allegiance to the gang. He testified that he has known Correa for a long time and that they are associates.

On July 8, 2011, Desautels wrote a witness statement detailing the arrest, in which he stated that he and Desmarais were on routine patrol when they came across Correa's vehicle. There is no mention in that statement of a confidential source directing the officers to Correa or of the July 2011 tip. Desautels further omitted any reference to rounding up other officers to execute the traffic stop, and there was nothing in the report about how the officers had staked out the neighborhood with three patrol cars. Desautels testified at the hearing that he "omitted certain stuff to protect my source" because he felt the source was "in grave danger of possibly being killed" if the information was disclosed. (Tr. 45:24–25; 80:17–18.) He further stated: "I made the decision to not include it in my report because I wanted to not deceive the Court but to deceive [Correa]. I didn't want him to know who [the source] was." (Tr. 81:9–13.)

Desautels admitted that he knew the statements would be provided to the ATF, the prosecutor, and defense counsel, and they may end up before the Court, and that he did not disclose the omissions upon learning that the case had been charged in federal court. Desautels further stated that he considered it an "extreme" situation in that one of the passengers was a known gang member who had already been arrested for a firearms offense, there was a feud between two gangs, and the second passenger had just completed a ten-year prison sentence for manslaughter.

---

**2.** He later testified that he was not sure what time it was, but that it was dark outside.

He testified that this was the first time he had omitted information of this kind from a police report.

In a witness statement prepared by Officer Desmarais approximately five weeks after the arrest, Desmarais also omitted any reference to a confidential source or tip, and he did not state that three police vehicles were deployed to the neighborhood in search of the green Maxima. Desmarais testified that, before writing his witness statement, he went back and read the incident report prepared by Desautels.

Desmarais also stated that he omitted this information in order to protect the source. According to Desmarais, Desautels and Desmarais had a conversation the night of July 7th about protecting the confidential source, but they never discussed omitting information from their reports. He stated that they never discussed the decision to omit information from the reports and that it was simply "common sense at that point." (Tr. 106:16.) Desautels testified that he did not tell Desmarais to omit the information from his witness statement and that they never talked about what Desmarais should write in his report. He said that this was a "unique" situation and that it was not the regular practice of the Department.

At some point between March 16 and March 20, 2012, Agent Yankee of the ATF contacted Desautels to inform him that Yankee was preparing for the instant suppression hearing, and he asked Desautels whether there were any narcotics surveillance reports, narcotics reports, or dispatch tapes. Desautels responded that there were no surveillance reports or dispatch tapes, because they had not been dispatched, but he said he would look into it further. On March 23, 2012, Desautels found a tape that he believed would expose the confidential source. He contacted Agent Yankee on March 24th, explained the situation, and told him that he needed to speak with the Assistant U.S. Attorney handling the case because he was worried about putting his source in danger.

On March 30, 2012, the government filed a supplemental response to its objection to the motion to suppress, stating:

> After the Government filed its Objection to Defendant's Motion to Suppress, it learned from the arresting officer that at the time the defendant was arrested *the officers were not on routine patrol as stated in the Government's Objection and in the officer's witness statement.* In fact, Confidential Source information had been received by officers that the defendant would be in the area where he was detained while in possession of a firearm.

(Gov't's Supp. Resp. to its Obj. to the Def.'s Mot. to Suppress 1, ECF No. 19.)

## II. Discussion

### A. Credibility

Correa argues that the misrepresentations made in the officers' statements render the officers' testimony, as a whole, not credible. In stating that "the officers were not on routine patrol as stated in the Government's Objection and in the officer's witness statement," (*id.*) the government effectively concedes that the witness reports contain affirmative misstatements or falsities, and not mere calculated omissions. The government does not argue that the officers were privileged to omit such information or to make affirmative misrepresentations. There can be no question that the officers should have been forthright and honest in their statements and reports, even as they acted to protect the safety of a confidential source. The government pleads that, while the officers acted improperly and exercised poor judgment, they acted in good faith and with the salutary motive to protect the source, not to deceive the Court, and their omission

and deception should effectively be excused because of this absence of malice.

The evidence makes plain that Desautels contacted Agent Yankee only when he feared that the falsehoods would come to light, and not before. Desautels knew that the case was going to be prosecuted in federal court and that the ATF agent, prosecutor, defense attorney, and potentially the Court would receive and rely on these statements. It was only when he listened to certain audio recordings and realized that it would be revealed to others that a confidential source was feeding the officers information the night of the arrest, that Desautels came clean to the Assistant U.S. Attorney about the misleading police statements.

The actions of these two officers are troubling. Police reports are relied upon by law enforcement, prosecutors, and defense counsel, not to mention the public and the Court, as an accurate (even if not an absolutely complete) reflection of events. When officers take liberties with the truth, even for well-intentioned reasons, they create suspicion and risk derailing the prosecution of their case.[3]

Yet, while the conduct of the officers in this case is troubling, it appears to the Court that the conduct is an isolated incident of poor judgment, not a symptom of a larger problem with truth-telling. The officers' conduct, while inappropriate, does not doom their credibility as to the events that occurred the evening of the arrest. The Court has carefully reviewed the officers' testimony and finds it credible, both with respect to the reasons why the officers did what they did in their reports, as well as to the surveillance, arrest, and search of Defendant and his vehicle.

Defendant argues that, in addition to the problems with the reports, the officers' credibility is undermined because their recollections of Correa's consent are contradictory. But this argument is unpersuasive. It is true that Desautels could not recall whether he was walking to the rear of the cruiser or placing Correa in the backseat when consent was given, and Desmarais testified that, when Desautels returned from placing Correa in the cruiser, Desautels told the officers to search the car. These statements are not inconsistent. It is plausible that Correa gave consent when Correa was either on his way into the backseat or already in the backseat of the cruiser. The fact that Desmarais did not hear Correa give consent does not make the recollection of the officers inconsistent.

Defendant also offered a contrary version of the events through Defendant's confederate, Calderone, but virtually none of his testimony is credible. As a member (former or present) of the Hartford Soldiers gang and an associate of Correa, Calderone had every reason to skew his testimony in Correa's favor. In addition, Calderone's timeline was not plausible—he testified that Correa picked him up from fishing and the traffic stop occurred shortly thereafter, approximately *three hours* earlier than it actually occurred. Moreover, even if the Court were to give the benefit of the doubt to Defendant and credit Calderone's version of events, his testimony does not preclude the possibility that Correa consented to the search when Calderone was out of earshot.

## B. The Traffic Stop

■ A perceived traffic violation "permits officers to effect a limited seizure of

---

**3.** The Court does not mean to imply that the report should have been written in such a way so as to expose the identity of the source. Rather, when protection of a source is of paramount importance, as it was here, great care must be taken to be truthful even while being discreet.

the driver and any passengers consistently with the Fourth Amendment." *United States v. Fernandez*, 600 F.3d 56, 59 (1st Cir.2010). The principles controlling the scope of *Terry* stops have been extended to traffic stops, and officers may "take similar measures to protect their safety, notwithstanding modest additional intrusion on the privacy rights of drivers and passengers." *Id.*

The government contends that the officers had probable cause to pull over Correa's vehicle because he had not used his left turn signal before turning. In the alternative, the government argues that the officers had reasonable suspicion to conduct a *Terry* stop because (1) Desautels had received a tip in June 2011 that a Hispanic man named Mike drove a green, four-door Maxima carrying a concealed firearm; (2) Desautels observed Correa engaging in conduct consistent with street-level drug dealing in June 2011; and (3) the day of the July 7, 2011 traffic stop, Desautels received information from an arrestee that Correa would be on the South Side, driving a green Maxima with a gun in the vehicle's engine compartment.

Defendant contends that the traffic stop was not justified because he was not required to use his left turn signal, pursuant to R.I. Gen. Laws § 31–16–5,[4] and that the sum of Desautels's information did not amount to reasonable suspicion to conduct a traffic stop.

█ The Court credits Desautels's uncontradicted testimony that Correa did not use his turn signal before turning on to Byfield Street. And while Defendant's argument, that he was not required to use his turn signal because the turn would not affect traffic, gets kudos for creativity, it fails under scrutiny. The Supreme Court of Rhode Island declined to entertain a similar argument in *State v. Lombardi*, 727 A.2d 670, 672–73 (R.I.1999). So long as there were other cars in the area, which there were in this case, Correa was required to use his turn signal pursuant to § 31–16–5, because "other traffic may be affected by the movement." R.I. Gen. Laws § 31–16–5; *see also Lombardi*, 727 A.2d at 673 (noting that the defendant's argument failed, in part, because there was no evidence in the record suggesting that there were no other vehicles in the area when he turned).

Because the Court concludes that the officers had probable cause to stop Correa for a traffic violation, it does not need to reach the issue of whether the officers had reasonable suspicion to justify the stop based on the information Sergeant Desautels had received from the arrestee, the anonymous source in June 2011, and his June 2011 investigation.

C. The Search

█ It is well established that "a warrantless search may be conducted with the voluntary consent of a person authorized to give such consent." *United States v. Chaney*, 647 F.3d 401, 405–06 (1st Cir. 2011) (citing *United States v. Stierhoff*, 549 F.3d 19, 23 (1st Cir.2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93

---

4. R.I. Gen. Laws § 31–16–5 states:
   No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in §§ 31–16–2 and 31–16–3, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway, unless and until the movement can be made with reasonable safety. *No person shall so turn any vehicle without giving an appropriate signal in the manner described in this chapter in the event any other traffic may be affected by the movement.* Violations of this section are subject to fines enumerated in § 31–41.1–4.
   (Emphasis added.)

S.Ct. 2041, 36 L.Ed.2d 854 (1973))). The government contends that the officers' search of the vehicle was lawful because Correa consented to the search and, in the alternative, because the officers had probable cause to conduct the search in light of the June 2011 tip, Desautels's observations in June 2011, and the tip received in July 2011. In support of his motion, Defendant makes three arguments: (1) he did not consent to the vehicle search; (2) once the toy gun was found, the officers should have un-cuffed him before asking to search the car; and (3) there was no probable cause to search.

As discussed above, the Court concludes that Desautels's testimony that Correa consented to the search of the vehicle is credible. The Court must address, therefore, whether his consent was voluntarily provided, and, if the consent was ineffective, whether the search was nonetheless justified because the officers had probable cause.

Correa argues that, even if the Court finds that he consented to the search, the consent was coerced. He says that, once the officers discovered the toy gun, he should have been released from handcuffs before the officers requested his consent to search. Correa concedes that, assuming that the traffic stop was justified, the officers were also justified in removing the three passengers from the car, handcuffing them, and conducting a sweep for firearms. But, Correa argues, once it was discovered that the vehicle cabin contained only a toy gun, the officers were no longer justified in keeping Correa in custody and interrogating him because the *Terry* stop had ended.

■ Whether a defendant's consent to a warrantless search was voluntary, and not a result of coercive tactics, "is a question of fact to be determined from an examination of the totality of circumstances." *Chaney*, 647 F.3d at 407 (quoting *United*

*States v. Marshall*, 348 F.3d 281, 286 (1st Cir.2003)). To determine whether consent was voluntary under the totality of the circumstances, the Court considers several factors, including the defendant's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." *Id.*

Correa is in his mid-twenties, and he had had prior experience with the criminal justice system. *See Chaney*, 647 F.3d at 408 ("It is reasonable to infer that a veteran of the criminal justice system will be 'less likely than most to be intimidated by the agents' show of force.'" (quoting *United States v. Barnett*, 989 F.2d 546, 556 (1st Cir.1993))). Additionally, the environment in which Correa gave his consent was not so coercive as to render it involuntary. It is true that there were five police officers and three police cruisers present and that the officers placed Correa, in handcuffs, in the backseat of one of the patrol cars. But, once the officers found the toy gun, and prior to Correa's consent, Desautels told him that he was "all set." Indeed, the fact that Correa laughed and offered up consent *unsolicited* demonstrates clearly that he was not intimidated. *See United States v. Trueber*, 238 F.3d 79, 95 (1st Cir.2001) ("While sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, custody alone has never been enough in itself to demonstrate … coerced … consent to search." (quoting *United States v. Collazo–Aponte*, 216 F.3d 163, 187 (1st Cir.2000)) (internal quotation marks omitted)). In light of Calderone's suspected gang affiliation, Correa's known, and significant, criminal record, and the multiple tips that there was a firearm in the car, the officers had veritable safety concerns justifying the use of handcuffs while they executed the consented-to search.

Accordingly, the Court finds that the officers' search of Correa's vehicle was lawful because Correa voluntarily consented to the search. And because Correa gave effective consent to the search, the Court does not need to reach the government's argument that it also had probable cause to search.

## III. Conclusion

For the foregoing reasons, Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.