# United States Court of Appeals
## For the First Circuit

No. 02-2003

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM MICHAEL OSBOURNE,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Chief Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Miriam Conrad, with whom the Federal Defender's Office was on brief for appellant.
Patrick M. Hamilton, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

April 16, 2003

**HOWARD**, **Circuit Judge**.    Defendant-appellant William Michael Osbourne appeals the partial denial of his pretrial suppression motion, arguing that a statement made by the district court in the course of its extemporaneous oral ruling evinced both a misunderstanding and material misapplication of Terry v. Ohio, 392 U.S. 1 (1968).  Specifically, Osbourne contends that the court upheld a second pat-frisk of his person -- one that led to his arrest for unlawful firearm possession -- only after mistakenly concluding that, once there were legitimate grounds to pat-frisk him, there was no limit to the number of pat-frisks that officers on the scene were permitted to conduct.  Our analysis of the context in which the court made the statement convinces us that Osbourne has read too much into it and that the court's ruling was not based upon legal error.  We summarize the facts that lead us to this conclusion.

Late in the afternoon of September 18, 2001, Boston Police Detective Robert Fratalia was driving in the Roxbury section of Boston to scout out locations where a youth violence investigative team with which he was working would be executing search warrants in the coming days.  Federal agents Daniel Campbell and Michael Oppenheim accompanied Fratalia.  The contemplated warrants were to target members of the Esmond Street gang, which Fratalia knew to be involved in drug trafficking, firearms offenses, and street violence with a rival gang.  One of the

residences to be searched was Osbourne's. Fratalia had specific knowledge that Osbourne was a member of the Esmond Street gang's "inner circle" and a likely target in the on-going feud with the rival gang. Fratalia also had been told that Osbourne carried a 9-millimeter firearm on his person at all times.

As he was driving down Walnut Street, Fratalia noticed Osbourne's parked car. Fratalia then observed Osbourne himself walking down the street with one Clifford Carr. Although he contested it below, Osbourne now concedes that, when Fratalia first spotted him, Fratalia had grounds to reasonably suspect that Osbourne was in unlawful possession of a firearm. Fratalia decided to act on his suspicion by conducting a Terry stop of Osbourne. He alerted Campbell and Oppenheim to Osbourne's presence, pulled his police vehicle alongside of Osbourne and Carr, let Campbell and Oppenheim out, and parked the car diagonally across the sidewalk in front of them. At the suppression hearing, Fratalia described what happened next:

> Special Agent Campbell had gone towards ... Osbourne, Special Agent Oppenheim kind of stayed in back of Campbell closer to the curbing where it met the street. I got out of the vehicle and went immediately over to where Osbourne and Carr had been. Special Agent Campbell did a quick pat-frisk of Mr. Osbourne and went right to Mr. Carr upon him seeing me being right next to him.

As Campbell began his pat-frisk of Carr, Fratalia conducted a pat-frisk of Osbourne. Almost immediately, Fratalia detected what he

believed to be the handle of a gun in Osbourne's waistband.  He removed the item, discovered that it was a fully loaded 9-millimeter semi-automatic handgun, and arrested Osbourne.

On October 17, 2001, a grand jury indicted Osbourne for being a felon in unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (2000).  On February 27, 2002, Osbourne filed a written motion to suppress evidence of the gun (as having been seized in violation of Terry) and certain statements he made to the officers following his arrest (as having been elicited in violation of Miranda v. Arizona, 384 U.S. 436 (1966)).  Insofar as Osbourne sought suppression of the firearm, his motion argued only that Fratalia lacked grounds for a reasonable suspicion that Osbourne was armed and dangerous when Fratalia first saw him walking down the street with Carr.  On March 20, 2002, the government filed a written opposition to Osbourne's motion, contending that the pat-frisk leading to the discovery of the firearm was authorized under Terry because Fratalia reasonably suspected that Osbourne was unlawfully armed when he initially spotted Osbourne and Carr.  Attached to the government's submission was, inter alia, an affidavit from Fratalia acknowledging that "Campbell [had] cursorily pat-frisked Osbourne before moving over to Clifford Carr" and before Fratalia conducted the pat-frisk that led to the discovery of the firearm.  It was thus uncontested from the outset that Fratalia was the second officer to pat-frisk Osbourne.

From April 3 to April 5, 2002, the district court conducted a hearing on Osbourne's motion. Consistent with his written motion, Osbourne sought during the hearing only to develop grounds for arguing that Fratalia lacked a basis to reasonably suspect Osbourne of being unlawfully armed and dangerous when he first spotted him on the street. Consequently, the lion's share of the parties' closing arguments focused on the reliability of the data giving rise to Fratalia's suspicion prior to the stop. But just before concluding (and after the government had completed its presentation), Osbourne's counsel introduced an entirely new line of argument:

> [L]et me actually go back because I skipped a very crucial point, if I may.
>
> The testimony was that Detective Fratalia let Agent Campbell and Agent Oppenheim out of the car, and Agent Campbell frisked Mr. Osborne ... first .... So the question, and I think it is a significant question in this case, is what justified the second frisk. And I would suggest that that second frisk is not a legitimate frisk under Terry. Certainly not in the absence of any evidence that the first frisk was not thorough; not in the absence of any evidence that Agent Campbell -- excuse me, that during the time between frisk number one and frisk number two Mr. Osbourne did anything that would suggest that he may have gained access to a weapon that was missed the first time. So, frisk number two I would suggest isn't a Terry frisk at all. It's a search. And it requires probable cause.
>
> Now, that is consistent in terms of it being a protective frisk, even if it's a frisk, that rationale evaporates if ... one of

those officers has already done a protective frisk and has not found anything.

Immediately after Osbourne's counsel concluded, the district court issued an oral ruling denying Osbourne's motion insofar as it sought to suppress evidence of the firearm as having been obtained in violation of the Fourth Amendment. The court first found facts consistent with the rendition we have just provided and concluded that Fratalia had grounds to reasonably suspect Osbourne of being unlawfully armed and dangerous when the episode began. As we have already stated, Osbourne does not challenge this ruling on appeal. The court then addressed and rejected Osbourne's argument that Fratalia's pat-frisk was unlawful because it followed Campbell's and was unaccompanied by evidence that Campbell's was incomplete or inadequate. In doing so, the court stated:

> In the event, and this is an interesting wrinkle, it was not [Fratalia] who first pat-frisked Mr. Osbourne but it was Mr. Campbell, Officer Campbell, a younger officer,[1] and not part of Fratalia's Boston Police force. Now, Fratalia was watching the situation. So he knew that Campbell had already touched, and characterized it as a pat frisk and I accept that.
>
> And so the question is what justified Detective Fratalia from doing it himself? Well, it seems to me it was a rapidly evolving situation, and with two individuals, as Fratalia approached, Campbell moved over to

---

[1]All agree that this comment was mistaken and that there was no evidence that Campbell was younger than Fratalia.

-6-

Carr, it's not clear that Oppenheim was doing anything but surveilling the scene, I think it was good police work. <u>I don't think there's a limitation on the number of people who can pat-frisk you.</u> And I think for his own safety, I don't think fear need enter into it, I think for his own safety and those of the other officers Detective Fratalia, under the same standard, reasonable suspicion, though at that time there was not probable cause, could pat-frisk Mr. Osbourne, and then the weapon was discovered. That's the Fourth Amendment analysis. (Emphasis supplied).

Construing the underlined text as reflecting a belief on the district court's part that the "police may frisk a suspect as many times as they wish, assuming a lawful basis for the first frisk," Appellant's Br. at 9, Osbourne argues that the remark represents an erroneous distillation and application of <u>Terry</u> that undermines the court's suppression ruling. If we shared Osbourne's understanding of the statement, we would be inclined to agree. While many areas of Fourth Amendment doctrine are characterized by specific bright line principles designed for straightforward application by law enforcement officers, <u>see</u> <u>Atwater</u> v. <u>City of Lago</u>, 532 U.S. 318, 347 (2001), "reasonableness" in the context of a <u>Terry</u> stop is given content by balancing the need for the encroachment against its nature case by case and in light of all the attendant circumstances, <u>id.</u> at 347 n.16; <u>id.</u> at 366 (O'Connor, J., dissenting); <u>United States</u> v. <u>Sokolow</u>, 490 U.S. 1, 7-8 (1989); <u>United States</u> v. <u>Chhien</u>, 266 F.3d 1, 6 (1st Cir. 2001). Consequently, a one-size-fits-all rule such as the one Osbourne has

inferred from the court's statement would be unusual, if not an anathema, in the context of Terry. But we do not understand the court's comment to reflect such an underlying perspective.

Rather, we regard the district court's "there is no limitation" comment to be a rejection of what it understood to be Osbourne's own suggestion of an applicable categorical rule: that a second pat-frisk is per se unreasonable in the absence of evidence that the first frisk was cursory or that the subject of the frisk had an opportunity to arm himself in the interim. And in our view, the court was entirely correct to reject this suggestion. Cf. Sokolow, 490 U.S. at 7-8 (rejecting a specific two-part rule designed by a court of appeals to assess the reasonableness of Terry stops of suspected drug couriers). We can envision myriad factual contexts in which courts could be called upon to assess the reasonableness of multiple pat-frisks of a single suspect. Especially given the absence of record evidence concerning the effectiveness of pat-frisks, our adoption of Osbourne's rigid formulation would unduly cabin the reasonableness inquiry to be conducted in such cases every bit as much as the rule he says the court applied. See id.

In the end, the reasonableness of a second or subsequent pat-frisk conducted pursuant to Terry is to be determined under a standard that takes account of the fact that "context is vital." United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002). The

standard is familiar:  "A police officer may frisk a suspect -- that is, search the suspect's person for weapons -- on reasonable suspicion that the suspect is armed and dangerous."  United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001), cert. denied, 535 U.S. 1007 (2002).  Here, the context in which Fratalia frisked Osbourne led the district court to conclude that Fratalia still entertained such a reasonable suspicion as to Osbourne, notwithstanding Campbell's "quick" (to use Fratalia's description) initial frisk of him.  We agree with the court's conclusion.  This was not a case involving an unknown suspect; Fratalia had specific information that Osbourne was "always" armed with a semi-automatic weapon and was a member of a violent street gang.  Moreover, as the court observed, Fratalia encountered Osbourne in "a rapidly evolving situation" in which the investigating officers needed to keep tabs on not one suspect but two.  Under the circumstances, Fratalia reasonably declined to regard the frisk conducted by Campbell as conclusive on the question whether Osbourne was armed and dangerous.

Accordingly, we **affirm** the court's partial denial of Osbourne's motion to suppress.