# United States Court of Appeals
## For the First Circuit

No. 16-2465

UNITED STATES OF AMERICA,

Appellee,

v.

TODD RASBERRY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Joshua L. Gordon for appellant.
Benjamin M. Block, Assistant United States Attorney, with
whom Halsey B. Frank, United States Attorney, was on brief, for
appellee.

February 14, 2018

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**.  Todd Rasberry found himself in a jam: during a pat-down incident to a Terry stop, see Terry v. Ohio, 392 U.S. 1, 19-20 (1968), an agent of the Drug Enforcement Administration (DEA) discovered a softball-sized object stashed in Rasberry's undershorts.  Believing that the object contained drugs, the agent arrested Rasberry on the spot.  A subsequent search of Rasberry's person proved the agent's prescience.

Following his indictment for controlled substance offenses, Rasberry moved to suppress, arguing among other things that the seizure of the contraband violated the "plain feel" doctrine.  See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).  After the district court denied his motion, Rasberry tendered a conditional guilty plea.  The court accepted the plea and sentenced Rasberry to serve 138 months' imprisonment.

We reject Rasberry's attempt to pigeon-hole the seizure that occurred within the narrow confines of the "plain feel" doctrine.  Here — as in most Terry stop cases — the reasonableness of the search and seizure is informed by the totality of the circumstances.  Applying this metric, we affirm the district court's denial of Rasberry's motion to suppress.

## I.  BACKGROUND

We rehearse the facts as found by the district court at the suppression hearing, consistent with record support.  See United States v. Gonzalez, 609 F.3d 13, 15 (1st Cir. 2010).  For

- 2 -

some years, Paul Wolf, a DEA agent, had been on the trail of a major drug dealer known to him only as "Champagne." Though Champagne proved elusive, Wolf finally got a lead indicating that he was in fact a man named Todd Rasberry. With the help of a cooperating source, Wolf was able to track down one of Rasberry's accomplices while she was making drug deliveries in Portland, Maine. When Wolf confronted the accomplice, she surrendered the heroin she was carrying and told Wolf that he would find Rasberry, along with more drugs, at a motel room she had rented in Scarborough, Maine. The accomplice gave Wolf a key to the room and consented to its search.

Accompanied by other officers (federal and local), Wolf proceeded to the motel where Rasberry was allegedly ensconced. The officers knew that Rasberry had a criminal history including drug and weapons charges, and he had been arrested only a few months earlier at a party where guns were present. As a result, the officers were armed and wore ballistic vests.

When the officers arrived at the motel, Wolf tried the room key that he had been given, but discovered that it did not work. Once he knocked, though, Rasberry opened the door and acknowledged that he was a guest in the motel room (which had been rented by the woman with whom Wolf had spoken). The officers told Rasberry that they were there to search the premises and that, although he was not under arrest, he would be detained while they

conducted the search. One officer placed Rasberry's hands behind his back and handcuffed him; he then patted down only the portion of Rasberry's lower back that Rasberry might be able to reach despite being handcuffed. Two other officers, with weapons drawn, conducted a sweep of the premises to make certain that nobody else was present.

For roughly twenty minutes, the officers searched the motel room with great care. They found plastic sandwich bags, needles, and a digital scale, but no drugs. With the search winding down, Rasberry asked if the handcuffs could be removed. Wolf replied that before he could remove the handcuffs, he had to make sure that Rasberry did not have a weapon.

As Wolf performed a pat-down, he felt (in the groin area of Rasberry's shorts) a hard, round object about the size of a softball. Wolf inquired as to the nature of the object, and Rasberry responded that it was part of his anatomy. At that point, Wolf — confident that the object was not part of Rasberry's anatomy but, rather, was contraband — placed Rasberry under arrest. Reaching into Rasberry's undershorts, Wolf extracted a ball of baggies containing what appeared to be controlled substances. A field test subsequently confirmed that some of the baggies contained heroin and others contained cocaine.

In due course, a federal grand jury sitting in the District of Maine returned a three-count indictment against

Rasberry for various controlled substance offenses. Rasberry moved to suppress the drugs seized from his person, arguing that the search and seizure had violated his Fourth Amendment rights. See U.S. Const. amend. IV. The district court held a hearing at which Wolf and his three fellow officers testified. The district court took the matter under advisement and later denied the motion to suppress. In its order, the court held, in substance, that what had transpired constituted a lawful Terry stop; that placing Rasberry in handcuffs was reasonably necessary to ensure the officers' safety; and that the duration of the detention was reasonable because the officers were diligently searching the room during that interval. Finally, the court upheld the seizure of the drugs from Rasberry's undershorts on alternative grounds: first, the court adopted the argument, put forward by the government, that the drugs were lawfully seized under the "plain feel" doctrine; and second, the court concluded that, in light of the totality of the circumstances, the officers had probable cause to arrest Rasberry, search him incident to his arrest, and seize the drugs.

Rasberry proceeded to enter a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), to a single count of possession of heroin with intent to distribute, see 21 U.S.C. § 841(a)(1). After accepting Rasberry's conditional plea (explicitly preserving Rasberry's right to appeal the denial of his suppression motion),

the district court imposed a 138-month term of immurement. The government then dismissed the other two counts of the indictment, and this timely appeal followed.

## II. ANALYSIS

Our standard of review is familiar. Ultimate constitutional determinations with respect to issues such as reasonable suspicion and probable cause engender de novo review. See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007). And while the district court's other conclusions of law are also reviewed de novo, its factual findings must be accepted unless they are clearly erroneous. See United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001). Determinations about witness credibility are inherently fact-based and, thus, are peculiarly within the competence of the district court. See United States v. Baldacchino, 762 F.2d 170, 175 (1st Cir. 1985).

As a practical matter, Rasberry's asseverational array can be divided into four parts. First, he asserts that his detention in the motel room exceeded the lawful scope of a Terry stop. Second, he asserts that the pat-down during which the softball-sized object was discovered was conducted without reasonable suspicion. Third, he asserts that the seizure of the softball-sized object was not justified under the "plain feel" doctrine. Fourth, he asserts that the search of his undershorts

- 6 -

was so invasive that it offended both his dignity and his right to privacy under the Fourth Amendment. We examine these assertions one by one.

## A. The Scope of the Stop.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This constitutional protection does not pretermit all searches and seizures, but only those that are unreasonable. See Terry, 392 U.S. at 9. A brief investigatory stop "based on a reasonable suspicion that criminal activity may be afoot does not violate the Fourth Amendment, even in the absence of probable cause." United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011) (citing Terry, 392 U.S. at 29-30). Such stops are commonly called Terry stops.

In contrast to a Terry stop, an arrest requires that the detaining officer have probable cause to believe that a crime has been committed. See Hayes v. Florida, 470 U.S. 811, 815-16 (1985); United States v. Chaney, 647 F.3d 401, 408 (1st Cir. 2011). Probable cause is a prerequisite not only for a formal arrest but also for a de facto arrest. See Chaney, 647 F.3d at 408.

Judicial review of a Terry stop involves a "two-step appraisal." Pontoo, 666 F.3d at 26. To begin, the stop must be justified at its inception. See United States v. Acosta-Colon, 157 F. 3d 9, 14 (1st Cir. 1998). Then, as the stop proceeds, the

officers' actions must be "reasonably related in scope to the circumstances which justified the interference."  Id.  (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).

Rasberry does not dispute that — at the moment the motel room was entered — the officers had reasonable suspicion sufficient to initiate a Terry stop.  Instead, Rasberry's challenge to the lawfulness of the stop focuses on the events that subsequently transpired.  He submits that the behavior of the officers (such as placing him in handcuffs and brandishing weapons) and the duration of the stop (about twenty minutes) pushed the stop past the boundaries of a lawful Terry stop and combined to transmogrify the stop into a de facto arrest.

In this case, the distinction between a Terry stop and a de facto arrest is of decretory significance.  After all, the government concedes that the officers did not have probable cause to arrest Rasberry at the moment they entered the motel room.  We turn, then, to the proper characterization of the events.

Because a Terry stop allows an individual to be detained without probable cause, the police actions associated with the stop must be less intrusive than those that are permissible in the course of an arrest.  See Pontoo, 666 F.3d at 30.  If a stop begins as a Terry stop but becomes too intrusive, it will morph into a de facto arrest.  See Hayes, 470 U.S. at 815-16; Acosta-Colon, 157 F.3d at 14.  The dispositive question is whether a reasonable

person standing in the suspect's shoes would understand his position "to be tantamount to being under arrest." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).

To be sure, there are no "scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests." Morelli v. Webster, 552 F.3d 12, 20 (1st Cir. 2009). In determining the category into which a particular set of events falls, a reviewing court necessarily must consider the totality of the circumstances. See Chhien, 266 F.3d at 6; see also United States v. Cortez, 449 U.S. 411, 417 (1981) (directing consideration of "the whole picture"). An inquiry into the totality of the circumstances is informed by the reasonableness of the officers' conduct in light of the situation that they face. See Terry, 392 U.S. at 19-20; Acosta-Colon, 157 F.3d at 15. Typically, such an inquiry involves examining, among other things, "the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998).

Notwithstanding the limitations on Terry stops, officers must be allowed, during the course of such a stop, to take measures that are reasonably calculated to protect themselves or others from harm. See Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004);

- 9 -

Acosta-Colon, 157 F.3d at 18. To pass muster, though, such prophylactic measures must be proportionate to the perils associated with the particular circumstances. See Pontoo, 666 F.3d at 30. Security precautions, such as the use of handcuffs, must be based on the officers' "reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." Acosta-Colon, 157 F.3d at 19. The inquiry is case-specific: although often indicative of an arrest, see id. at 18, "neither the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest," United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005).

Concerns for officer safety are heightened in the close confines of a motel room. See Chaney, 647 F.3d at 410. There is a pressing "need for officers to safely secure the scene." Id. at 410. Moreover, the motel room in which Rasberry was found had very thin walls, and any gunfire would have posed a grave danger to occupants of adjoining rooms. To cinch matters, Rasberry was a suspected drug trafficker, and "[t]he connection between drugs and violence is . . . legendary." United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014). This legendary connection was of particular concern in this case because the officers were entering an unfamiliar space to confront a suspect who they knew had a

criminal history involving firearms and who had recently been present in locations where guns were found.

Taking the total mix of facts into account, we agree with the district court that the officers had a reasonable basis to suspect that Rasberry might be armed and dangerous. By entering the premises with guns drawn and immediately handcuffing Rasberry, the officers acted responsibly to ensure their safety and the safety of others as their search of the premises took place. At the same time, the officers made it clear to Rasberry that he was not under arrest but, rather, was simply being detained while they searched the room. We discern no error, clear or otherwise, in the district court's determination that the officers' execution of the stop was within the permissible scope of a Terry stop. See Pontoo, 666 F.3d at 30; Chaney, 647 F.3d at 410.

Nor did the duration of the encounter exceed the parameters of a lawful Terry stop. A twenty-minute detention may be lengthier than the paradigmatic Terry stop, but the length of a Terry stop, taken in a vacuum, does not convert an otherwise lawful Terry stop into a de facto arrest. See United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999). Whether a Terry stop is of an appropriate duration is gauged by whether the officers were "diligently pursu[ing] a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe,

- 11 -

470 U.S. 675, 686 (1985). Here, the district court supportively found that the officers were assiduously engaged in activities in furtherance of the investigation for the entire time of the detention. Seen in this light, the court did not err in finding that the twenty-minute length of the stop failed to convert it into a de facto arrest. See Owens, 167 F.3d at 750 (finding stop that lasted fifty minutes was not a de facto arrest); United States v. McCarthy 77 F.3d 522, 531 (1st Cir. 1996) (finding seventy-five minute detention remained a Terry stop because officers were not "engaged in dilatory tactics" and "their investigative efforts [were] reasonable under the circumstances").

That ends this aspect of the matter. The stop in this case was proportional to the circumstances and lasted no longer than was reasonably necessary to search the motel room and dispel suspicion that illegal drugs were hidden there. Consequently, the district court did not err in concluding that the stop was a lawful Terry stop.

## B. The Pat-Down.

In preparation for removing Rasberry's handcuffs, Wolf undertook a full pat-down of Rasberry's person. Rasberry contends that there was no legal justification for this pat-down because the initial frisk, performed when he was first handcuffed, sufficed to dispel any suspicion that he might be armed. The district court rejected this contention, and so do we.

A police officer may frisk a suspect on reasonable suspicion that the suspect is armed and dangerous. See United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001); see also Terry, 392 U.S. at 27. In this instance, the full pat-down was preceded by an initial frisk some twenty minutes earlier. The district court found, however, that the initial frisk was confined to the area of Rasberry's lower back. This finding is consistent with the officers' testimony at the suppression hearing, and it is not clearly erroneous. And where, as here, the first frisk is limited, it will not automatically dispel a reasonable suspicion that the suspect may be armed. See United States v. Osbourne, 326 F.3d 274, 278 (1st Cir. 2003). In appropriate circumstances, a second frisk may be justified. See id. This is such a case: because the first frisk was restricted to Rasberry's lower back, we cannot say that the district court erred in finding that Wolf had a reasonable suspicion that Rasberry might be carrying a weapon elsewhere on his person.

## C. **The Seizure of the Softball-sized Object.**

As he was conducting the second pat-down, Wolf felt a softball-sized object hidden in Rasberry's undershorts. After Rasberry dissembled by insisting that the object was part of his anatomy, Wolf arrested him and proceeded to extract the object. Rasberry challenges the constitutionality of this seizure.

The district court upheld the seizure on alternative grounds. The first of these grounds is questionable. The court — following the government's lead — invoked the "plain feel" doctrine, under which a police officer can seize an object if, by touch, its incriminating character is "immediately apparent." United States v. Schiavo, 29 F.3d 6, 9 (1st Cir. 1994) (quoting Dickerson, 508 U.S. at 375). Thus, the doctrine permits an officer who conducts a lawful pat-down of a suspect's outer clothing to seize an object if its incriminating character is immediately apparent by touch alone.

Rasberry argues that, due to the plastic packaging surrounding the drugs, the incriminating nature of the object in his shorts could not have been immediately apparent to Wolf. This argument has a patina of plausibility, but we need not address it: the seizure is fully justified on the alternative ground elaborated by the district court. Consequently, we turn to that alternative ground.

The district court held that the totality of the circumstances known to Wolf at the time of the pat-down gave him probable cause to arrest Rasberry and, thus, allowed him to seize the softball-sized object incident to Rasberry's arrest. This holding finds ample support in the record.

It is common ground that a Terry stop can evolve to a point at which there is probable cause to make an arrest. See

Terry, 392 U.S. at 25. At that juncture, the officer can search the suspect for evidence or contraband incident to the arrest. See id. That is precisely what happened here.

Probable cause is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). It "requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." Kaley v. United States, 134 S.Ct. 1090, 1103 (2014) (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)) (internal quotation marks omitted). An objective standard is employed to determine whether an officer has probable cause to effect an arrest. See Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004). An inquiring court must examine the events leading up to the arrest and then determine "whether these historical facts, viewed from the standpoint of a reasonable police officer, amount to probable cause." Ornelas v. United States, 517 U.S. 690, 696 (1996).

Here, the totality of the circumstances militates strongly in favor of a finding that probable cause existed to arrest Rasberry. The officers already had recovered some drugs from Rasberry's accomplice (the renter of the motel room). She had told them that Rasberry was in the room and was in possession of additional drugs. When the officers reached the motel, they found Rasberry in the designated room — confirming to that extent

the reliability of the accomplice's account. See Gates, 462 U.S. at 245 (explaining that tip containing information subsequently found to be accurate can be a factor giving rise to probable cause). In the motel room, the officers' search revealed accoutrements of the drug trade (specifically, plastic baggies, needles, and a digital scale), giving rise to a plausible inference that a drug-distribution operation was afoot. See, e.g., United States v. Fermin, 771 F.3d 71, 79 n.6 (1st Cir. 2014).

The officers had been told by Rasberry's accomplice that there were drugs in the motel room and, after scouring the room in vain, the only place that had not yet been searched was Rasberry's person. While patting Rasberry down, Wolf came across a suspicious object in Rasberry's undershorts — an object that Wolf reasonably suspected contained drugs. This suspicion was heightened by Wolf's knowledge that drug dealers frequently conceal drugs in their undergarments. See United States v. Cofield, 391 F.3d 334, 337 n.2 (1st Cir. 2004) (discussing how suspects often hide drugs in their underwear). When Rasberry was asked directly about the softball-sized object, he responded with an obvious lie. A suspect's blatant prevarication in response to an officer's queries can support an inference of probable cause. See, e.g., United States v. Brown, 500 F.3d 48, 57 (1st Cir. 2007).

To say more would be to paint the lily. Here, a host of factors pointed unerringly to a reasonable inference that Rasberry

was hiding drugs in his skivvies.  In the circumstances at hand, the district court did not err in finding that Wolf had probable cause to arrest Rasberry and to seize the softball-sized object incident to his arrest.

### D. **The Intrusiveness Claim.**

Rasberry makes a final argument: that the search of his undershorts was overly invasive and degrading and, thus, abridged his Fourth Amendment rights.  Because this argument is raised for the first time on appeal, our review is for plain error.  See United States v. Madsen, 809 F.3d 712, 717 (1st Cir. 2016).  Plain error is plainly absent here.

The reasonableness of an invasive search depends on whether the totality of the circumstances justifies the degree of the intrusion.  See Spencer v. Roche, 659 F.3d 142, 146 (1st Cir. 2011); Cofield, 391 F.3d at 336.  To justify a search of a particularly intimate area, an officer must, at a minimum, have reasonable suspicion that the person detained is hiding contraband there.  See United States v. Barnes, 506 F.3d 58, 62 (1st Cir. 2007).  Wolf — having just encountered a suspicious object near Rasberry's groin — had excellent reason to think that Rasberry had contraband hidden in his undershorts.

Although extracting the softball-sized object was, in Wolf's phrase, "awkward," there is no evidence that the extraction was conducted in a needlessly degrading or humiliating fashion.

- 17 -

Cf. Swain v. Spinney, 117 F.3d 1, 6 (1st Cir. 1997) (finding strip search of female detainee in front of male officers unconstitutional). Wolf and Rasberry were of the same gender and Wolf withdrew the softball-sized object in the privacy of a motel room, allowing Rasberry to remain clothed as he did so. It was Rasberry's decision to hide contraband in such an intimate location, and the seizure was performed in a reasonable manner. No more was exigible to keep Rasberry's Fourth Amendment rights inviolate.

## III. CONCLUSION

We need go no further. Rasberry's appeal yields only bitter fruit and, therefore, the judgment of the district court is

**Affirmed.**