NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0085n.06

No. 19-5165

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 05, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| RODNEY JACKSON, | ) ) | |
| Defendant-Appellant. | ) ) ) | |

BEFORE: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Rodney Jackson appeals his conviction and sentence for possession with intent to distribute methamphetamine. He argues that the district court erred in denying his motion to suppress the methamphetamine, which was discovered on his person after a drug dog alerted on his vehicle during a traffic stop. He also appeals the district court's ruling denying him an offense-level reduction for acceptance of responsibility. We affirm.

I.

Officer Douglas Ullrich was working third-shift patrol for the Covington, Kentucky police department on October 4, 2017. At about 1:20 a.m., Officer Ullrich was patrolling a portion of eastern Covington which he knew had "constant trouble with drug[s]." He observed defendant Rodney Jackson sitting in the driver seat of a parked SUV. Jackson landed on Officer Ullrich's

radar because Jackson expressed a "a strong look of alarm" as Ullrich drove past. Immediately thereafter, Officer Ullrich observed Jackson pulling away from the curb without signaling. Then he saw Jackson make two right turns, again without signaling.

Based on the observed traffic infractions, Officer Ullrich made a U-turn and caught up to Jackson's vehicle and conducted a traffic stop. As he approached, he used his flashlight to illuminate the inside of the vehicle, to which Jackson remarked that he "didn't need to do all that stuff." Unprompted, Jackson then told Ullrich that there were "no illicit drugs" in his vehicle. Once Ullrich explained the reason for his presence—the traffic infractions—he asked for Jackson's license, registration, and insurance, but Jackson was only able to produce his driver's license. And while Jackson rummaged around in his vehicle, he made several other statements that led Officer Ullrich to suspect that criminal activity was afoot. First, he repeated that Officer Ullrich should not worry because there were no drugs in the car. Then, Jackson told Ullrich that he "worked for the feds," specifically for, "Peter Lakes of the federal government department," which he later said meant the DEA. However, Jackson informed Ullrich that his work with Lakes "was classified and he couldn't talk about it," nor could he put Ullrich in touch with Lakes or anyone else who could confirm their association.

After hearing Jackson's story, Ullrich requested that an officer with a drug dog respond to the scene. He then returned to his squad car to begin writing Jackson a citation—a process that was complicated by Jackson's failure to provide a valid registration or proof of insurance. When Ullrich ran Jackson's name through his computer, he also learned that Jackson was on federal supervised release and that he had multiple prior convictions for drug trafficking.

Nine minutes after the stop began, Specialist Mike Lusardi and his canine partner Ernie arrived. Lusardi's first move was to ask Jackson to step out of his vehicle for precautionary

reasons. He then patted Jackson down for weapons before passing him back to the other officers. After that, Specialist Lusardi walked Ernie around defendant's vehicle twice. The first pass, which Lusardi termed an "ambient air scan," did not result in an alert from Ernie. But on the second trip, Ernie alerted for narcotics on the driver side door.

Once Ernie alerted, Specialist Lusardi searched the vehicle while Officer Ullrich searched Jackson's person. Officer Ullrich recalled that, during the search, Jackson was "kind of . . . leaning his body up against" a nearby vehicle "which was preventing . . . access to the front of his body." Ullrich also asked Jackson to spread his feet, but Jackson replied that he could not spread his feet more broadly than shoulder-width apart. Officer Ullrich found this suspicious, so he handcuffed Jackson for safety purposes. Officer Ullrich then patted down the front of Jackson's body, including his groin area. There, he located a "large bulge" that was "clearly not part of his person," and which Ullrich immediately suspected to be drugs.

Officer Ullrich set about retrieving the drugs from Jackson's groin area. He unbuckled Jackson's belt and zipper and pulled Jackson's pants straight away from his body with his right hand. With his other hand, Officer Ullrich stuck his hand down into Jackson's groin and retrieved the parcel he had felt during the search—the contents of which were later revealed to be methamphetamine. Officer Ullrich's search resulted in Jackson's pubic hair and buttocks being partially exposed, but the whole process took between five and ten seconds. With the contraband secured, Officer Ullrich returned Jackson's pants to their normal position and placed defendant under arrest.

A grand jury charged Jackson with possession with intent to distribute methamphetamine, and Jackson filed a motion to suppress the methamphetamine, arguing that the initial traffic stop, use of a drug dog, and search of his person all violated his Fourth Amendment rights. The district

court held an evidentiary hearing and took testimony from numerous witnesses, including Jackson and two bystanders who had witnessed the encounter. The court then denied Jackson's motion in a written opinion. Jackson proceeded to a jury trial, where he conceded that he possessed the methamphetamine, but argued to the jury that the DEA authorized him to possess it, so the evidence did not establish that he had intended to distribute the drugs. The jury was not convinced, and it convicted defendant.

At sentencing, Jackson objected to the presentence report, which recommended that the district court deny him an offense-level reduction for acceptance of responsibility. Defendant argued that he had attempted to enter a conditional guilty plea, so he had accepted responsibility and should receive the two-level deduction attendant to acceptance. The district court overruled Jackson's objection, reasoning that he had never admitted to possession with intent to distribute the methamphetamine and had instead contested the evidence produced by the government at trial. Jackson's offense level was thus calculated at 37, which when combined with Jackson's criminal history category, resulted in a Guidelines range of 360 months' imprisonment to life. The court imposed a sentence of 336 months' imprisonment, to be served consecutively to the other terms of imprisonment that were imposed upon Jackson for violation of his supervised release and in a state court case. Jackson timely appeals.

II.

First, Jackson appeals the district court's denial of his motion to suppress. "When reviewing a district court's ruling on a motion to suppress, we will reverse findings of fact only if they are clearly erroneous. Legal conclusions as to the existence of probable cause are reviewed de novo. When the district court has denied the motion to suppress, we review all evidence in a

light most favorable to the Government." *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (brackets, internal citations, and quotation marks omitted).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Jackson claims that the initial stop of his vehicle was an unreasonable seizure and that the search of his car and person were also unreasonable. We find no merit in these issues.

*The initial stop.* First, Jackson claims that Officer Ullrich violated his Fourth Amendment rights by making the initial traffic stop because Ullrich allegedly decided to stop him based solely on the look of alarm he had observed. Jackson says that because Ullrich had "already decided" to stop him at that point, prior to any observed traffic violation, it violated his Fourth Amendment rights.

We disagree. Officer Ullrich's subjective intentions are not relevant to our analysis. *Whren v. United States*, 517 U.S. 806, 812–13 (1996). It is undisputed that prior to effectuating the stop, Ullrich observed Jackson pull away from the curb and turn right without signaling. He therefore had probable cause to believe defendant committed multiple traffic violations and lawfully stopped defendant's vehicle. *See, e.g.*, *United States v. Herbin*, 343 F.3d 807, 809–10 (6th Cir. 2003).

*Use of a drug dog.* Second, Jackson argues that the officers' use of a drug dog violated his Fourth Amendment rights because the dog sniff was not supported by reasonable suspicion, or alternatively, even if the initial pass was constitutional, the officers still violated his Fourth Amendment rights by conducting a "second sniff." We reject both arguments.

As an initial matter, whether the officers had reasonable suspicion for the dog sniff only comes into play if the use of the drug dog extended the seizure. *Illinois v. Caballes*, 543 U.S. 405, 409–10 (2005) (holding that use of narcotics-detection dog during a lawful traffic stop "generally does not implicate legitimate privacy interests"); *Rodriguez v. United States*, 575 U.S. 348, 350 (2015) ("We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). Specialist Lusardi responded with Ernie in 9 minutes—before Officer Ullrich had finished ticketing Jackson. We therefore conclude that, like *Caballes*, the officers' use of the drug dog did not implicate Jackson's legitimate privacy interests. 543 U.S. at 409–10; *see e.g.*, *United States v. Marsh*, 443 F. App'x 941, 942–43 (6th Cir. 2011) (concluding that a fifteen-minute traffic stop was permissible as it was not longer than reasonably necessary to issue the traffic citation).

But even assuming the officers had exceeded the time needed to handle the traffic stop, Officer Ullrich had reasonable suspicion to use the drug dog. As Officer Ullrich approached Jackson's car after making the traffic stop, Jackson made numerous unprompted statements which created reasonable suspicion regarding his possession of illegal drugs. Jackson told Ullrich that there were "no illicit drugs" in the car and told Ullrich that he was working with a DEA agent but because his status was classified, he could not talk about it. Under these circumstances, we conclude that Officer Ullrich had a particularized basis for suspecting criminal activity based on specific and articulable facts. Accordingly, the initial sniff by the drug dog was lawful, even if it had extended the seizure beyond the time necessary to complete the traffic stop. *See United States v. Winters*, 782 F.3d 289, 298–304 (6th Cir. 2015) (concluding that officers had reasonable suspicion to extend traffic stop for a dog sniff based on nervousness of car occupants, their

inconsistent explanations for their travels, and the fact that they were using a rental car but were not listed as authorized drivers).

Jackson's "second-sniff" theory fares no better. He posits that because Ernie did not alert on his first pass around the vehicle, the officers' reasonable suspicion dissipated completely, so there was no basis to further prolong the stop by having Specialist Lusardi take Ernie for another lap around the vehicle. We review this argument for plain error, because Jackson did not raise it before the district court. *United States v. Hunter*, 558 F.3d 495, 501 (6th Cir. 2009). Thus, Jackson bears the burden of establishing (1) error, (2) that is plain, and (3) which affects his substantial rights. *Id.*

We discern no error. Jackson's argument rests on a false factual premise, namely that Ernie had completed his drug sniff at the time he completed his first pass around the vehicle. Rather, Specialist Lusardi's testimony establishes that the two laps around the vehicle were part of the same search because they were done in immediate succession. That distinction sets this case apart from *United States v. Davis*, because there, the first dog *never* alerted to the vehicle, and the officers detained the defendant for an additional hour so that a *second* drug dog could be brought to the scene, unreasonably extending the seizure. 430 F.3d 345, 356 (6th Cir. 2005). Jackson has given us no case suggesting that Specialist Lusardi violated his Fourth Amendment rights by walking Ernie around his vehicle twice in the course of a single search. Accordingly, we conclude that defendant cannot meet his burden on plain error review.

*Search of Jackson's person.* Jackson also contends that Officer Ullrich's search of his person violated the Fourth Amendment, relying primarily on *Bell v. Wolfish*, 441 U.S. 520 (1979).[1]

---

[1]Jackson conceded at oral argument that he was seized at the time of Officer Ullrich's search, and that there was probable cause for the seizure. His only argument concerning the search of his person is that it was conducted in a constitutionally unreasonable manner.

*Bell* mandates that we "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted" when assessing whether an intrusive search is unreasonable and thus violative of the Fourth Amendment. *Id.* at 559. We conclude that the balance of the *Wolfish* factors support a finding that the search was lawful.

First, we reject Jackson's contention that Officer Ullrich's search was not justified because Specialist Lusardi had already frisked him for weapons. The respective officers' searches served different purposes: Specialist Lusardi was concerned only with officer safety, because he was freshly on the scene and had just ordered Jackson out of his vehicle. Officer Ullrich, on the other hand, was searching Jackson's person incident to arrest because Jackson was seized once Ernie alerted for narcotics on the car where Jackson had been sitting. The need for a more intrusive search arose only after Ullrich gained probable cause to believe Jackson was carrying drugs on his person based on his detection of the "unnatural bulge." *See United States v. Rasberry*, 882 F.3d 241, 251 (1st Cir. 2018) (concluding that officers were justified in reaching into defendant's undershorts to remove concealed contraband); *United States v. Williams*, 477 F.3d 974, 976 (8th Cir. 2007) (similar).

Similarly, the scope of the seizure weighs in favor of reasonableness. Officer Ullrich's search took between five and ten seconds—only the time necessary to pull Jackson's pants away from his body and retrieve the suspicious object. Once the suspected drugs were seized, Ullrich terminated the search. Thus, we conclude that the scope of the search was reasonable. *See, e.g.*, *Williams*, 477 F.3d at 976 ("[I]t was not unreasonable for the officers to assume the initiative by seizing the contraband that Williams secreted in his underwear.").

Jackson argues that Officer Ullrich's method for the search—*i.e.,* unbuckling Jackson's pants and pulling them away from the front of his body—rendered it unreasonable because Ullrich caused his pubic hair and buttocks to be exposed for several seconds during the search. He also claims that the public location of the search rendered it unreasonable because there were four onlookers at street-level, and two additional persons looking on from their window.

We do not view these facts to shift the balance. The search was brief, and while it occurred on a public street, the record establishes that it was a dark night, and the only other persons present were 50 or 60 feet away. The officers did not strip Jackson of his clothes, visually inspect his body cavities, penetrate his body, or forcibly expose private areas of Jackson's body for a prolonged time. These factors distinguish Jackson's case from those he cites, including *Campbell v. Miller*, where the plaintiff was arrested in his friend's yard at 8:00 p.m. on a summer evening and subjected to a visual inspection of his anal cavity in view of his friends, 499 F.3d 711, 714–715 (7th Cir. 2007), and *United States v. Ford*, where an officer fully exposed the defendant's buttocks on a heavily traveled roadway during broad daylight and penetrated his rectum during a body cavity search. 232 F. Supp. 2d 625, 630–31 (E.D. Va. 2002).

In sum, based on the totality of the circumstances, we conclude that Officer Ullrich's search of Jackson, while moderately intrusive, was reasonable under the Fourth Amendment. *See United States v. Doxey*, 833 F.3d 692, 706 (6th Cir. 2016) ("Although removing the baggie protruding from [defendant's] buttocks was an invasion of privacy beyond that caused by a visual search, what occurred here was a constitutionally permissible search that was reasonable under the totality of the circumstances.").

III.

That leaves us with Jackson's sentencing argument. Guidelines § 3E1.1(a) states that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," the district court must "decrease the [total] offense level by 2 levels." Defendant contends that the district court erred in applying § 3E1.1 by denying him acceptance of responsibility. "The district court's decision to deny an acceptance-of-responsibility reduction is entitled to great deference on review," *United States v. McCloud*, 730 F.3d 600, 605 (6th Cir. 2013) (citation omitted), and therefore we "typically review for clear error," *United States v. Denson*, 728 F.3d 603, 614 (6th Cir. 2013).

The thrust of defendant's argument is that he raised a "legal challenge" to the charge against him, which he says cannot be used to deny him the offense-level reduction. However, Jackson plainly contested the factual basis for guilt at trial by arguing that he was authorized to possess the methamphetamine and did not intend to distribute it. And it is equally plain that § 3E1.1 is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt." U.S.S.G. § 3E1.1 cmt. n.2; *see also United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010) (relying on application note 2 to affirm the district court's denial of acceptance of responsibility). Accordingly, we reject Jackson's argument that the district court committed procedural error in calculating his Guidelines range.

IV.

For these reasons, we affirm the judgment of the district court.