Not for Publication in West's Federal Reporter

# United States Court of Appeals
## For the First Circuit

No. 19-1244

UNITED STATES OF AMERICA,

Appellee,

v.

NERA JAMES, a/k/a King,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Clifford B. Strike for appellant.
Julia M. Lipez, Assistant United States Attorney, with whom
Halsey B. Frank, United States Attorney, was on brief, for
appellee.

February 20, 2020

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER**, <u>Associate Justice</u>.  Defendant Nera James pleaded guilty to two counts of possession with intent to distribute furanyl fentanyl, 21 U.S.C. § 841(a)(1), but reserved his right to appeal the district court's denials of two motions to suppress evidence.  He now appeals those denials, as well as the district court's application of a firearms sentence enhancement under U.S.S.G. § 2D1.1(b)(1).  We affirm.

I

In late 2016, officers affiliated with the Maine Drug Enforcement Agency and the Auburn and Lewiston Police Departments began receiving information that a man, nicknamed "King," was distributing fentanyl in Lewiston and Auburn.  Sources reported that King resided at 91-93 Walnut Street in Lewiston, was known to carry drugs on his person, and sold fentanyl in the common areas of apartment buildings near Walnut Street.  They described King as a black male in his thirties with distinctive "blemishes" on his face.  On December 19, 2016, Detective Nicholas Gagnon observed someone matching King's physical description enter the hallway of a Lewiston apartment building, only to leave abruptly after seeing the officer.  At the time, Detective Gagnon was conversing with a known drug addict, who confirmed that the departed person was a fentanyl dealer named King.

The next day, Detective Gagnon and several other officers were driving near 91-93 Walnut Street when they observed a man walking in the middle of the road. Concerned that the pedestrian was causing a hazard, the officers pulled closer to him and then realized, based on his physical features, that he resembled the dealer their sources had described and Detective Gagnon had earlier encountered, called King. The officers got out and asked the man for identification. He stated that his name was Nera James. The officers patted James down and enquired about the contents of his shopping bag. Detective Gagnon told James that it would not be "a big deal" if the bag contained marijuana. James stated that his bag did in fact contain marijuana. Detective Gagnon grabbed the bag and found numerous baggies of suspected heroin or fentanyl inside. The officers arrested James and administered a warning under Miranda v. Arizona, 384 U.S. 436, 444 (1966). Up to the point of arrest, the encounter lasted no more than five minutes.

On February 6, 2017, James posted bail subject to several conditions, including submission to "searches of [his] person, vehicle and residence . . . at any time without articulable suspicion or probable cause." Not long after, Detective Gagnon and Corporal Brian Beauparlant learned from several sources that James may have resumed trafficking in drugs. On May 3, 2017, Detective Gagnon, Corporal Beauparlant, and several other officers

performed a bail compliance check for James. After securing James, they searched his apartment, porch, and an unlocked "shed" or closet within the building near his apartment and rented as appurtenant to it, though physically separate from it and accessible from the porch area. Inside the shed, they found a sock containing live ammunition, a stolen shotgun, two handguns, a bag containing 600 baggies of fentanyl, and other drugs.

James filed two motions to suppress, respectively, the evidence discovered during his December 20, 2016 roadside encounter and the May 3, 2017 search. After the district court had denied both motions, James entered the conditional guilty plea. At sentencing, he challenged the district court's application of a two-level guideline enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm during the commission of a drug-trafficking crime. The district court applied the enhancement and imposed a 67-month sentence.

II

James's first assignment of error goes to the district court's denial of his motion to declare the roadway stop and questioning an unlawful seizure of his person under the Fourth and Fourteenth Amendments, and to suppress all resulting evidence as fruit of the violation. There was, however, no error.

The circumstances lend themselves to more than one analysis, and the trial court considered three alternatives. We

- 4 -

need to review only one: that the stop was lawful under the standard of <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968). "[I]t is well-settled that, based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or 'seizure' of an individual to investigate suspected past or present criminal activity." <u>United States</u> v. <u>McCarthy</u>, 77 F.3d 522, 529 (1st Cir. 1996). Here, the evidence amply supports the articulable suspicion that James was the individual who had recently been selling fentanyl in the area in violation of 21 U.S.C. § 841(a)(1), and was continuing to engage in that criminal behavior.

As noted before, several of the officers in the car that evening had been told by drug users known to them that fentanyl was being distributed by a black man in his thirties showing a facial skin abnormality like the one that James displayed. The street where James was walking was near the places of the encounters the users had described. To clinch the issue of reasonable suspicion, Detective Gagnon recognized James after having seen him recently as he approached the scene of an anticipated drug sale. The police were accordingly reasonable beyond the point of suspicion in believing that James was engaged in local drug trafficking, and under <u>Terry</u> were justified in detaining him to enquire about his activities.

While a <u>Terry</u> stop must be limited to reasonable circumstances including duration, <u>see</u> <u>United States</u> v. <u>Rasberry</u>,

- 5 -

882 F.3d 241, 248 (1st Cir. 2018), the evidence here was that the conversation was no longer than about five minutes before suspicion was confirmed to the point of probable cause to arrest for possession of illegal drugs in the officers' presence. Once the conversation had moved from the ostensible subject of the State law illegality of walking in the traveled roadway,[1] and had come to the point of enquiring about the contents of the bag James was carrying, James admitted there was marijuana inside. The officers then had cause to conclude that James was possessing a substance in violation of then-existing State law, and the encounter thus passed from Terry detention to involuntary custody for commission of a crime in the officers' presence. See United States v. Brown, 500 F.3d 48, 56 (1st Cir. 2007).

Duration aside, there was no evidence that might have a bearing on James's claim that the behavior of the officers collectively was unreasonable as being oppressive beyond what Terry would allow.[2] Indeed, the only particular specification of

---

[1] "In determining whether an officer had reasonable suspicion to justify a Terry stop . . ., the officer's subjective motives do not enter into the decisional calculus." United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004) (citing Whren v. United States, 517 U.S. 806, 812 (1996)). What matters is "the objective significance of the particular facts under all the circumstances." Id. (quoting United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000)).

[2] There is no claim that the police improperly induced James to admit to the marijuana as the result of a suggestion that marijuana possession would not be "a big deal."

unreasonableness said to affect the admissibility of the government's trial evidence goes to James's statements made before receiving Miranda warnings.  Add. 12.  But no warning was in order until James was in custody, as distinct from Terry detention, United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005), and that point was not reached prior to the marijuana admission.  No statement made by James thereafter was admitted that had not been preceded by the warnings, and James offers no argument that any post-Miranda statement was inadmissible as having somehow been involuntary despite the warning.

## III

The second error James claims was the denial of his motion to suppress the evidence of drugs and firearms found in the search of the so-called "shed," the storage area within the apartment building adjacent to James's own apartment and rented to James as appurtenant to it but accessible from the porch area.  If his claim is sound, the Sentencing Guidelines enhancement for possession of a "dangerous weapon" would be without foundation.  U.S.S.G. § 2D1.1(b)(1).  We find no such error, however.

The officers searched James's rented apartment and the shed on the strength of the provision in James's state bail bond requiring him to "submit to searches" of his "person, vehicle and residence . . . at any time without articulable suspicion or probable cause."  James now says that the waiver of objection was

unreasonable as applied to his circumstances because the word "residence" was not meant to include the separate shed adjacent to the apartment and rented as appurtenant to it.  The trial court concluded that "in the absence of any developed argument on the point by Defendant," Add. 15, the shed was a part of the residence within the bail terms.  We see no plain error in so concluding, or in the trial court's further holding that on a contrary assumption James would have had no sustainable expectation of privacy necessary to give standing to raise a Fourth Amendment suppression claim.  See United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011).  James contends that the search violated the Fourth Amendment rights of the co-tenants in his apartment, who also had possessory interests in the shed, but a defendant cannot suppress the fruits of a search based on a violation of the Fourth Amendment rights of others.  See Alderman v. United States, 394 U.S. 165, 174 (1969).

IV

Finally, James argues that the guns discovered in his shed do not implicate the Guidelines enhancement for possession of a dangerous weapon, like a firearm, during the course of a drug trafficking crime, U.S.S.G. § 2D1.1(b)(1).  But the commentary to U.S.S.G. § 2D1.1(b)(1) directs that presence of a weapon with other indicia of drug activity is sufficient for the enhancement to apply, "unless it is clearly improbable that the weapon was

connected with the offense."  Here, on the date of the search, the three guns seized were stored directly next to the drugs supporting James's guilt of possessing prohibited drugs with intent to distribute them.  Given the obvious association between the guns and the drugs, see United States v. Corcimiglia, 967 F.2d 724, 727 (1st Cir. 1992), and the lack of evidence to the contrary in this case, we find no clear error in the trial court's conclusion that the guns were "part and parcel of the drug operation."  Add. 23. Nor can James's claim that the guns belonged to one of his co-conspirators alter this result; even if that were true, the firearm enhancement applies when "it was reasonably foreseeable to the defendant that firearms would be possessed by others during the conspiracy."  United States v. Burgos-Figueroa, 778 F.3d 319, 321 (1st Cir. 2015).

Affirmed.